**In re A.V.B.I., INC., a California Corporation dba Alpine Village Brewing Company, Debtor.**

Bankruptcy No. LA 91–68607.

United States Bankruptcy Court, C.D. California.

July 29, 1992.

Dennis McGoldrick, Gardena, Cal., for debtor.

Marcy J.K. Tiffany, Los Angeles, Cal., U.S. Trustee.

Robert W. Beck, Torrance, Cal., Stephen E. Smith, Danning, Gill, Gould, Diamond & Spector, Los Angeles, Cal., for Dr. Burke.

## OPINION DENYING CONFIRMATION OF PLAN

LISA HILL FENNING, Bankruptcy Judge.

### I. *Introduction*

The key issue in this bitter confirmation battle is whether, as a matter of law, a plan providing for current shareholders to retain an option to purchase new equity in the reorganized debtor violates the "absolute priority" rule under 11 U.S.C. Section 1129. To exercise that option, holders of old equity are required to contribute cash to fund the plan. The corporate debtor proposes to "cram-down" its plan over the negative votes and objections of several classes of creditors, relying on the controversial "new value" exception to the absolute priority rule. This Court concludes that any "new value" exception did not survive the codification of the absolute priority rule in the 1978 Bankruptcy Code. Because the plan violates the absolute priority rule, confirmation is denied.

### II. *Factual Background*

This case involves a no-holds-barred fight between the former president of a micro-

brewery and his successor over control of the debtor AVBI, Inc., which does business as Alpine Village Brewing Company. A beer manufacturer and wholesaler, the company has never turned a profit on an annual basis since its founding in 1987.

AVBI's founder and former president, Dr. Gunther Buerk, was ousted in February 1990 after he started another "brew-pub" business in a nearby town, allegedly in competition with debtor. He is one of the largest unsecured creditors of this estate on account of his claim for damages arising from the termination of his contractual relationship with the debtor. He wants to regain control of the company.

His successor as president, Dr. Jerry Blaskovich, is a shareholder and also the principal secured creditor of this estate. Blaskovich succeeded to the Bank of San Pedro's lien on the brewing equipment when he honored his guarantee of the debtor's bank loan that was in default. His repayment of the bank loan also triggered a subordination agreement with Buerk that has been the source of considerable controversy during the case.

Since the case was filed in March 1991, Buerk has vehemently objected to everything, including Blaskovich's secured claim, debtor's attorney fees, and the debtor's plan of reorganization. Buerk has also filed a competing plan himself, despite the threats of the debtor's landlord (also its principal customer accounting for 50% of the company's gross revenues) and its brewmaster that they will not do business with the reorganized debtor if he is in control. The debtor and Blaskovich likewise have objected to everything proposed by Buerk, including his claims and plan.

The resulting trench-warfare litigation has consumed an enormous amount of attorney and court time, money and resources, diverting the energy of the debtor's personnel from operations. While the principals fiddle, Rome burns: the debtor has continued to lose money and customers, recently falling dramatically behind on its post-petition accounts payable, withholding and income taxes.

The debtor's plan proposes to continue operation of the brewery under current management with a renegotiated lease. Payments on Blaskovich's secured claim would be made in full over an extended period. Originally the debtor's plan proposed no repayment to unsecured creditors. It has since been amended to provide for payment in full of the $11,000.00 in non-insider unsecured claims within thirty days of the effective date. Insider unsecured claims other than Buerk, totalling approximately $180,000.00, are to share *pro rata* quarterly payments of less than $900.00 each, which results in a return of less than 10% of the balance of their claims over a five-year period. The plan separately classifies Buerk's unsecured claims, proposing to pay nothing on the ground that they are disputed. Of the total of nine classes under the plan, five are impaired. Two of the impaired classes, including one of the classes of insider unsecured creditors and Buerk's class, voted against the plan.

Because this case has been first and foremost a fight for control, Buerk has strenuously objected to the treatment of the existing stockholders. The Third Amended Plan provides that, on its effective date:

> "[T]he outstanding stock of the debtor will be cancelled and new stock will be issued to the Debtor's shareholders, who will be offered the opportunity to purchase newly-issued shares."

Buerk contends that this provision violates Section 1129(b)(2)(B)(ii) because it allows the old equity to retain control of the company even though other creditors are being paid only pennies on the dollar for their claims.

## III. *Discussion*

Chapter 11 is designed to foster consensual plans of reorganization. To prevent dissenting creditors from exercising undue veto power over the process, Section 1129(b)(1) allows confirmation of a plan even over the negative votes of one or more classes, but only

> "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is

impaired under, and has not accepted, the plan."

It is up to the plan proponent facing negative votes whether to seek to "cram down" the plan on the dissenting classes.

Section 1129(b)(2)(B)(ii) defines "fair and equitable" to include the following requirements:

"(B) With respect to a class of unsecured claims—

"(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

"(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan *on account of* such junior claim or interest any property." (Emphasis supplied.)

In this case it is undisputed that the dissenting unsecured creditors will not receive or retain property equal to the allowed amounts of their claims. Thus, the alternative test set forth in Section 1129(b)(2)(B)(i) is not satisfied. It is also undisputed that the interest holders are junior to the unsecured creditors, and that under the plan they will receive the opportunity to buy the stock of the reorganized debtor. The question is whether this opportunity constitutes "property" made available to them "on account of" their old equity interest in violation of the absolute priority rule.

A. The Exclusive Option to Acquire a New Equity Interest Constitutes Property Received "on Account of" the Old Equity Interest

Buerk objects that the plan cannot qualify as "fair and equitable" because the right to acquire an interest in the reorganized debtor has been exclusively reserved to old equity, excluding any participation by the creditors. Debtor counters that the new stock will be sold to the old shareholders "on account of" their contribution of "new value," *i.e.*, cash, and not "on account of" their old equity interest. Acknowledging that status as an old equity holder is a *necessary* condition to be eligible under the plan to buy the new stock, debtor contends that the absolute priority rule is not violated because old equity status is not *sufficient* to entitle the holder to shares of the new stock.

■ Debtor's analysis fails to recognize that the exclusive right to control the reorganized debtor is itself "property" under (B)(ii). *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 207–08, 108 S.Ct. 963, 969, 99 L.Ed.2d 169, 180 (1988) (holding that a retained equity interest is "property" even if it has no market value); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1360 (7th Cir.1990) (holding that an option to purchase stock is "property" under Section 1129(b)(2)(B)(ii)).

A similar argument was equally unavailing to the plan proponent in *In re Lumber Exchange Ltd. Partnership,* 125 B.R. 1000, 1008 (Bankr.D.Minn.), *aff'd,* 134 B.R. 354 (D.Minn.1991). There the bankruptcy court granted relief from stay to a secured creditor on the ground that the proposed plan was unconfirmable as a matter of law due to violation of the absolute priority rule. Like the debtor here, the plan proponents argued that the equity interest was being retained *on account of* the new cash being infused, not "on account of such junior claim or interest." The court rejected this argument:

"A special opportunity or right afforded to members of a class of equity security holders to retain or acquire an equity position in a reorganized debtor through a new cash contribution under a plan is, by its very nature, the opportunity or right to receive or retain property on account of the prepetition interest held. When the opportunity is fulfilled, or the right exercised, clearly, the interest is retained or received *on account of* the prior interest, even though new consideration is paid in the transaction."

*Id.* at 1008 (Emphasis in original).

■ Under AVBI's proposed plan, the dissenting impaired creditors—specifically Buerk—are precluded from acquiring any equity interest in the reorganized debtor

even if they wish to contribute substantial capital. The creditors lack the requisite "old equity" status. The plan as proposed does in fact give junior interest holders "property"—the stock purchase option—"on account of" their old equity interest. On its face, therefore, this plan provision violates the absolute priority rule.

### B. The "New Value" Exception Did Not Survive Codification of the Absolute Priority Rule.

#### 1. Case Law on the "New Value" Exception is Sharply Divided.

Debtor argues that, even if the plan violates the absolute priority rule, it should be confirmable under the "new value" exception to that rule. The Ninth Circuit has not yet ruled on whether a "new value" exception survived the enactment of the Bankruptcy Code. Cases from lower courts in the Circuit are sharply split. *Compare, e.g., In re Outlook/Century Ltd.*, 127 B.R. 650, 654–57 (Bankr.N.D.Cal.1991) (summarizing cases and concluding that no such exception exists), with *In re Triple R Holdings, L.P.*, 134 B.R. 382 (Bankr.N.D.Cal. 1991) (partial codification of absolute priority rule did not eliminate the "new value" exception).

The other circuits are also split. The Sixth and Seventh Circuits have upheld confirmation of "cramdown" plans under the Bankruptcy Code based upon a "new value" exception. *In re Potter Material Service, Inc.*, 781 F.2d 99 (7th Cir.1986); *In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir.1986). Both decisions, without examination, treat the law on new value as settled. Because these decisions predate *Ahlers*, however, their unquestioning assumption of the settled nature of the law on new value lacks persuasive force. Both *Ahlers, supra*, 485 U.S. at 203, 108 S.Ct. at 967, and the Seventh Circuit's own subsequent opinion in *Kham & Nate's, supra*, 908 F.2d at 1362, questioned the continued vitality of any "new value" exception. Neither, however, expressly ruled on the issue: both courts determined that the proposed "new value" offered in those plans did not constitute actual "money's worth."

In the present case, however, this escape hatch is unavailable: it is undisputed that the plan requires a substantial cash infusion from those shareholders wishing to participate in the reorganized debtor. A direct ruling on the "new value" question is necessary.

More recently, the Fourth and Fifth Circuits have rejected the "new value" exception, although the Fifth Circuit's panel opinion has since been withdrawn. In late 1991, the Fifth Circuit issued its original opinion in *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991). Part IV of the opinion, intended to provide guidance on remand, flatly rejected the "new value" exception. The panel stated that the codification of the "absolute priority" rule in Section 1129(b)(2) set "a *minimum standard* for a fair and equitable plan that may be confirmed over creditor objections." *Id.* at 143 (emphasis in original). Because the legislative history of this section reflects that Congress expressly rejected a proposal to modify outright the absolute priority rule, the panel reasoned that it would be illogical to infer that Congress intended the "new value" exception to the rule to survive *sub rosa* the enactment of the Code. *Id.* at 143–44. It was thus the first circuit court decision to declare the death of the "new value" exception *nunc pro tunc* to the 1978 enactment of the Code.

Less than four months later, however, the Fifth Circuit *en banc* withdrew Part IV of the panel opinion without explanation. Judge Edith Jones, the author of the panel's opinion, sharply dissented, implying that the withdrawal was prompted by concern that the Supreme Court's intervening decision in *Dewsnup v. Timms*, —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), undercut the panel's statutory interpretation of Section 1129(b). As the "new value" portion of the panel opinion was admittedly *dictum*, the *en banc* court apparently preferred not to undertake a reassessment of the "new value" issue in light of *Dewsnup*. Instead, it simply withdrew Part IV of the panel opinion.

Not deterred by the withdrawal of the *Greystone* panel opinion, the Fourth Cir-

cuit has since endorsed its reasoning in rejecting the "new value" exception. *In re Bryson Properties, XVIII*, 961 F.2d 496, (4th Cir.1992). Like *Greystone, Bryson* involved a single asset real estate debtor seeking to cram down a plan on a dissenting undersecured mortgage holder. The plan separately classified the unsecured portion of the lender's claim. The equity holders proposed to furnish additional capital and retain their interests in full. Overturning the confirmation, the court held that the separate classification of the undersecured creditor's claim constituted impermissible gerrymandering of the confirmation vote. Like the *Greystone* panel, the Fourth Circuit also chose to rule on the "new value" issue as a matter of judicial economy to guide the bankruptcy court on remand. Guided by "the plain words of the statute," the court agreed with the lender's argument that, because "the debtor's equity holders were the only parties afforded the right to contribute new capital, ... they were allowed to 'buy' the property without exposing it to the market or otherwise allowing any other party, including [the lender] the opportunity to bid." *Id.* at 504. This provision violated the absolute priority rule of Section 1129.

Since the withdrawal of Part IV of *Greystone*, some courts have taken the Fifth Circuit's hint that *Dewsnup* supports, if not compels, the conclusion that the "new value" exception survived enactment of the Code. *E.g., In re SLC Limited V*, 137 B.R. 847 (Bankr.D.Utah 1992) (relying on *Dewsnup* in holding that the lack of any legislative history expressly eliminating the "new value" exception means that it continues to be a viable judge-made rule).

■ This Court recognizes that both of the conflicting lines of cases are based upon principled analysis of the Code and its history. Like several of the most controversial issues currently dividing the bankruptcy courts, the "new value" debate resembles the arguments over whether the famous optical illusion portrays two faces or a vase. For the illusion, both answers are correct; but courts facing a "new value" problem must choose one approach to

the exclusion of the other, even though there are elements of truth in both. This Court is persuaded by the reasoning of *Outlook/Century Ltd.* and *Bryson*: the better view is that a "new value" exception does not exist under the Code. Close analysis of *Dewsnup* does not undercut, and indeed may reinforce, this conclusion.

2. *The Statutory Language and Legislative History Show that the "New Value" Exception was Intentionally Omitted from the Codification of the Absolute Priority Standard.*

The "new value" exception to the absolute priority rule was first articulated in *Case v. Los Angeles Lumber Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), a reorganization case under Section 77B of the Bankruptcy Act of 1898. The plan in that case proposed to transfer all assets of the debtor to a new corporation, in which old shareholders, as well as old bondholders, would receive stock. The bondholders objected to the participation of the stockholders. The district court nevertheless confirmed the plan, finding that the stockholders' contribution of their management expertise and knowledge of the history of the company constituted sufficient consideration for their new stock. The Supreme Court reversed.

In an analysis that foreshadowed *Ahlers*, the Court held that the plan violated the "fair and equitable" standard because the contribution of the stockholders' experience was not "money, or money's worth" equal to the value of the new shares they were to receive. In *dictum*, however, the Supreme Court articulated the theoretical exception to the absolute priority rule that has become known as the "new value" exception:

"It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor.... [T]his Court [has] stress[ed] the necessity, at times, of seeking new money 'essential to the success of the undertaking' from the old stockholders. Where that necessity exists and the old stockholders make a fresh contribution and receive in return a

participation reasonably equivalent to their contribution, no objection can be made ..."

*Id.* at 121–22, 60 S.Ct. at 10–11 (footnote omitted.)

The Supreme Court, however, has never upheld confirmation of such a plan over a creditor's objection. Indeed, reported cases reveal few plans that have ever been confirmed on that basis. *In re Outlook/Century Ltd., supra,* 127 B.R. at 655 n. 7. Some commentators have suggested that, like other Supreme Court *dicta,* the "new value" exception has taken on a life of its own in the lower courts, without full examination of the implications of its underlying assumptions. *See,* J. Ayers, "Rethinking Absolute Priority After *Ahlers,*" 87 Mich.L.Rev. 963 (1989).

The plain language of Section 1129(b)(2)(B) contains no reference to any "new value" exception to the "fair and equitable" standard that it enunciates.

"[S]ection 1129(b)(2) states clearly that the standards defined in section 1129(b) are the *minimum* requirements for confirmation. *See Lumber Exchange,* 125 B.R. at 1007; *[In re] Winters,* 99 B.R. [658] at 663 [ (Bankr.W.D.Pa.1989) ]. The statute provides that a plan is fair and equitable with respect to unsecured creditors only if unsecured creditors are paid in full or if all junior classes (subordinated debt and equity) receive nothing. This definition contains no exceptions."

*In re Outlook/Century Ltd., supra,* 127 B.R. at 656.

Like the statutory language itself, the legislative history contains no suggestion that a "new value" exception was intended. *E.g.* 124 Cong.Rec. 32408 (Sept. 28, 1978). Most importantly, however, the new statutory definition of the "fair and equitable" standard was but one piece of the comprehensive overhaul of the reorganization provisions that resulted in chapter 11 of the Code. This overhaul recalibrated the allocation of powers between debtors and creditors in a multitude of provisions, not unlike the checks and balances of the United States Constitution itself. *See In re Outlook/Century Ltd.,* 127 B.R. at 656–658.

As *Ahlers* stressed, Section 1129(b)(2)(B) gives the creditors the ultimate decision whether to allow junior classes to participate in a plan that pays less than full value of the senior claims. *Ahlers,* 485 U.S. at 207, 108 S.Ct. at 969. The courts are poorly situated to second-guess that business judgment.

Perhaps the key difference between the Code's chapter 11 and the statutory context of the *Los Angeles Lumber* case is the debtor in possession concept and its implications. All Section 77B cases had court-appointed trustees in place: the debtors did not control the management of the company during the administration of the case. By contrast, under the Bankruptcy Code, chapter 11 cases overwhelmingly are operated by debtors in possession. Thus, a "new value" exception under Section 77B might have appeared obviously unobjectionable to the Supreme Court in *Los Angeles Lumber* because equityholders would only be allowed to buy back into the management of the company, after a trustee had been in place. The trustee presumably would have examined the books and operations and would have unearthed any dishonesty or mismanagement. On the other hand, in a chapter 11 debtor in possession case, a "new value" exception permits uninterrupted control by insiders. Creditors often fear that such cases are run for the private benefit of existing salaried management and the equity holders, with the intent of unfairly squeezing out the creditors.

*Consensual* "new value" plans involving cash infusions by existing management or equity are an extremely common and effective means of resolving chapter 11 cases. They should be encouraged. At issue here, however, are "new value" plans that have drawn objections because of their failure to provide sufficiently generous payments to creditors or sufficiently large new capital contributions by old equity to convince creditors that old equity has earned a place at the new table—or because creditors just do not trust the old management's ability to succeed where it has failed in the past. If the creditors are satisfied with the terms

of a "new value" plan, they vote for it. The confirmation criteria of Section 1129(b)(2)(B) are simply not triggered under those circumstances. It is only when the creditors exercise their business judgment to vote against the plan that the confirmation issue arises. In effect, Section 1129(b)(2)(B) of the Code gives the creditors—not the court—the right to decide whether to waive the absolute priority rule.

### C. The Dewsnup Decision Does Not Justify Endorsement of the "New Value" Exception

The foregoing analysis was based upon the plain language of Section 1129(b)(2)(B) with its codification of the absolute priority rule. The remaining question is whether the recent United States Supreme Court decision in *Dewsnup* changes the result, on the theory that the legislative history does not reflect an express rejection of the "new value" exception, and that therefore this pre-Code doctrine remains effective. This question was ducked by the Fifth Circuit *en banc* in *Greystone*, but used to support the decision in *SLC Limited, supra,* 137 B.R. 847 (Bankr.D.Utah 1992). Even if *Dewsnup's* approach to statutory construction was persuasive, the legislative history of the provisions at issue and the murkiness of relevant pre-Code precedents reinforce, rather than undercut, the plain meaning analysis set forth above.

The Supreme Court's recent opinions on the Bankruptcy Code—with the notable exception of *Dewsnup*—have emphasized a strict construction approach to analysis of the Code and Rules. *E.g., United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (interpretation of Section 506(b) turned on placement of comma); *Taylor v. Freeland & Kronz,* — U.S. ——, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) (objection to exemption precluded by missed deadline for filing objection despite obviously legally insupportable nature of exemption claim). Then, what are we to make of *Dewsnup?*

*Dewsnup* is, in many ways, a baffling opinion, bearing all of the earmarks of results-oriented compromise. Its holding is relatively straightforward: "lien-stripping" by chapter 7 debtors is prohibited. Debtors are not entitled to reduce the amount of claims secured by consensual liens to the current collateral value of revested property that has been abandoned by the trustee. Rather, the debtor's interest remains subject post-bankruptcy to the full amount of the voluntary lien. However desirable this result may be from a policy standpoint, the Court reaches this outcome only by circumventing the language of the Code, as Justice Scalia's dissent so effectively demonstrates. *Dewsnup* invites courts interpreting the Bankruptcy Code to ignore the plain meaning of the statutory language unless "convinced that Congress intended to depart from [a given] pre-Code rule." *Id.* — U.S. at ——, 112 S.Ct. at 778.

The peculiar problem that *Dewsnup* presents for lower courts is the absence of any clearly articulated standard for determining when to ignore the Code's plain meaning. The case at bar raises exactly this statutory construction issue, for upholding a "new value" exception to the absolute priority rules requires resort to extra-statutory sources of law. The "new value" exception was simply *not* written into the Code.

*Dewsnup* used a two-step process to reach its result. First, it looked to Congressional intent in enacting the Bankruptcy Code Section 506 to see if it revealed any intent to change pre-Code law on the question of whether liens were intended to pass through bankruptcy unaffected. As the parties acknowledged, the legislative history of Section 506 was entirely silent, making no reference to pre-Code precedents. Second, the Court assumed that it was settled under pre-Code law that "the creditor's lien stays with the real property until the foreclosure," because "[t]hat was what was bargained for by the mortgagor and the mortgagee." *Id.* — U.S. at ——, 112 S.Ct. at 778. So long as Congress did not express its unequivocal intention to overrule this supposedly settled proposition of law, the Court reasoned, it must have intended that pre-Code law pass through

the comprehensive restructuring of the bankruptcy laws unaffected.

As Justice Scalia observes in his dissenting opinion, this conclusion is particularly surprising in light of the Court's failure even to note—muchless address the implications of the fact—that the Section 506(d) lien-avoiding powers at issue were brand new, with no comparable provision existing under the former Bankruptcy Act or Rules, and indeed reflect the "entire rewriting" of the secured claims provisions. *Id.* —— U.S. at ——, 112 S.Ct. at 787, (J. Scalia, dissenting); 3 *Collier on Bankruptcy* ¶ 506.07, p. 506–64 (15th Ed.1988).

Moreover, a good argument could be made that the supposedly settled law on which *Dewsnup* relies was not so settled at all, and that in fact the Court has just revived a body of law generally thought to be moribund. Examination of *Dewsnup's* foundations illustrates the dangers of assuming that old case law arising under distinctly different statutory schemes should be controlling for interpretation of the Bankruptcy Code.

The cornerstone of *Dewsnup* was the Court's sweeping pronouncement that:

> "Apart from reorganization proceedings, see 11 U.S.C. §§ 616(1) and (10) (1976 ed.), no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt."

*Id.* —— U.S. at ——, 112 S.Ct. at 779. In support of this proposition, the Court relied principally upon *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). *Radford* invalidated the Frazier–Lemke Act, a Depression-era farmers' debt relief act, under the Takings Clause of the Fifth Amendment. Frazier–Lemke had granted farmers a five-year foreclosure moratorium, with the right to buy back the farm at its current "appraised" value, *i.e.*, below the amount of the secured debt, by installment payments at 1% statutory interest.

The *Dewsnup* Court cited *Radford* as the embodiment of a supposedly settled principle of law which must have been known to Congress in crafting Section 506

of the Code. This reliance is yet another surprising aspect of the opinion: when the Code was enacted in 1978, *Radford* was generally considered to have been almost totally eroded, even though not expressly overruled, by *Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937) (*Wright I*). *Wright I* upheld against a variety of challenges the *new* Frazier–Lemke Act ("Frazier–Lemke II") that was adopted just three months after *Radford* in direct response to its ruling. *See* J. Ayer, "Rethinking Absolute Priority after *Ahlers*," 87 Mich.L.Rev. 963, 980–84 (1989), for an extensive analysis of *Wright I* and related cases: *Wright v. Union Central Life Ins. Co.* ("*Wright II*"), 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938); and *Wright v. Union Central Life Ins. Co.* ("*Wright III*"), 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940). These cases, taken together, found constitutional the revised statute's provisions allowing the farmer to purchase the property at its current appraised value as against the lender's right of sale.

Technically, the *Wright* cases distinguished, rather than overruled, *Radford* on the ground that the rights of the secured creditor to determine when a foreclosure sale could be held or to control the property during default were "not substantive, but remedial rights and as such are subject to control under the bankruptcy power." 300 U.S. at 446, 57 S.Ct. at 559. Somehow, according to the Court's fuzzy explanation, the slightly modified version of *Frazier–Lemke II* taken as a whole, did not have the same effect as the original *Frazier–Lemke*, in impairing the rights of the secured creditor. Generally, however, this distinction had been viewed as more face-saving than principled, in light of the "court-stacking" political battles then swirling around the Court. In *Helvering v. Griffiths*, 318 U.S. 371, 401, 63 S.Ct. 636, 652, 87 L.Ed. 843 (1943), the Supreme Court commented upon swift Congressional action changing statute in response to an unpopular court decision:

> "There is no reason to doubt that this Court may fall into error as may other

branches of the Government. Nothing in the history of attitude of this Court should give rise to legislative embarrassment if in the performance of its duty a legislative body feels impelled to enact laws which may require the Court to reexamine its previous judgments or doctrine."

The footnote to this passage cites *Radford* as a prime example of an error by the Court that was quickly rectified. After *Helvering,* the Supreme Court relied on *Radford* in a decision only once in the next 17 years, and that was for the proposition that lien rights constitute a property interest protected by the Fifth Amendment—not for the idea that liens ride through bankruptcy unaffected. *Armstrong v. United States,* 364 U.S. 40, 44, 80 S.Ct. 1563, 1566, 4 L.Ed.2d 1554 (1960). Twenty-two more years would pass before a majority of the Supreme Court again relied on *Radford,* also for the proposition that there are Fifth Amendment limitations on the extent to which the bankruptcy statutes can "be used to defeat traditional property interests," like lien rights. *United States v. Security Industrial Bank,* 459 U.S. 70, 74, 103 S.Ct. 407, 410, 74 L.Ed.2d 235 (1982) (holding that consumer lien avoidance powers of Section 522(f) cannot be applied retroactively). In *Ahlers, supra,* Justice White notes that *Radford* raises potential constitutional issues that he deemed it unnecessary to address. It was not until the 1991 decision in *Farrey v. Sanderfoot,* — U.S. ——, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991), that the Court suddenly attributed to *Radford* the status of an icon of settled law on the inviolability of lien rights in bankruptcy.

The point is that, whatever the import of *Radford* now for the *future* jurisprudence of bankruptcy and the Court's increasingly insistent warnings that the Fifth Amendment limits what Congress can do to lien holders in bankruptcy, by the 1970's the case had fallen into disrepute. Having been severely undercut by subsequent cases, it was of doubtful continued vitality. Its resurrection still lay in the future. It did *not* represent settled law establishing that liens could never be abrogated in

bankruptcy. Thus, Congress would have had no reason to assume that the plain meaning of the language it was drafting into Section 506 of the Code would be interpreted as limited by *Radford.* Perhaps *Dewsnup* is really trying to tell us that this hypothetical constitutional limit was breached, without having a majority willing to say so expressly.

With respect to its methodology of Bankruptcy Code interpretation, *Dewsnup* does *not* teach that courts should rummage around in old case law to interpret Bankruptcy Code provisions that are susceptible of conventional statutory interpretation. While it is certainly true, as the Supreme Court observed, that "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate,'" *Dewsnup,* —— U.S. at ——, 112 S.Ct. at 779, that is an extreme understatement: Congress in fact writes bankruptcy laws on a very messy slate.

Indeed, in chapter 11 law especially, the slate is so messy and overwritten with conflicting lines of case law emerging out of quite divergent bodies of equity receivership law, and reorganization and liquidation statutes, that on many questions no clear single doctrine is discernable. Importing concepts from past reorganization cases into interpretation of the Code must be done gingerly, with proper attention to the context in which the original case arose.

Whatever one makes of *Dewsnup,* interpreting Section 1129(b)(2) by reference to pre-Code law is, if anything, an even more uncertain enterprise than for Section 506. Chapter 11 under the Bankruptcy Code reflects a melding of concepts derived from several distinct bodies of pre-Code law, including at least the following: equity receiverships, old Chapter X (reorganizations for publicly held companies), old Chapter XI (reorganizations for privately held companies), and Section 77 (railroad reorganizations). None of these predecessors contained the same balance of creditors' voting rights, pre-filing management's operational controls, and disclosure and confirmation standards. The conscious purpose expressed in the legislative history was to

create a new chapter that represented the best of all of these approaches to reorganization. In other words, Chapter 11 was intended to be different from its pre-Code ancestors. 5 *Collier on Bankruptcy* ¶ 1129.03, p. 1129–54.5 (15th Ed.1991).

Moreover, the Supreme Court's own peculiar disregard of the *Wright* cases in *Dewsnup* serves as a warning that, on most issues, there are too many inconsistent lines of cases in bankruptcy lore to be confident in assuming from legislative silence that some doctrines but not others were supposed to be left intact, even though excluded from the codification of related principles.

Section 1129, setting forth the confirmation standards, reflects a balancing of these competing interests. It describes two basic ways to confirm a plan: by consent of a majority of all voting classes, or by cramdown over objection provided that the indubitable equivalent standard is satisfied for secured creditors and the absolute priority rule protects unsecured creditors.

To allow for a "new value" exception in effect says there is a third way to confirm a Chapter 11 plan: without either obtaining full consent or satisfying the absolute priority rule, the debtor gets to keep the estate property without paying claims by putting new money on table. In fact, variants of that alternative already exist for qualifying debtors: they are called Chapters 12 and 13. But an extremely important creditor protection is built into those chapters that does not exist in Chapter 11: the disposable income test of Sections 1225(b)(1)(B) and 1325(b)(1)(B). To be confirmed over the objection of a creditor without paying that creditor in full, Chapter 12 and 13 plans must provide:

> "that all of the debtor's projected disposable income to be received in the [plan] period ... will be applied to make payments under the plan."

11 U.S.C. Section 1225(b)(1)(B) and 1325(b)(1)(B).

The practical effect of the "new value" exception would be to permit insiders to acquire the "going concern" value of the debtor in a private sale at which no other bidders are allowed and in which the seller (the impaired creditors) does not like the proposed purchase terms. This result contradicts both the plain language of section 1129(b)(2)(B) and the overall structure of Chapter 11 itself. It must be rejected.

CONCLUSION

The "new value" exception did not survive enactment of the Bankruptcy Code. Because the AVBI plan violates the absolute priority rule of Section 1129(b)(2)(B)(ii), it cannot be confirmed. Detailed findings of fact and an order shall be separately entered herewith.