KANNE, Circuit Judge,
dissenting.
Although I agree with the way the majority opinion handles many of the issues in this case, I must dissent because the plain language of the absolute priority rule, see 11 U.S.C. § 1129(b)(2)(B)(ii), does not include a new value exception. Moreover, even if one strains and finds ambiguity in the language of the statute, thus necessitating a look at pre-Code practice, see Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the shaky foundation of the pre-Code new value exception coupled with the massive changes in bankruptcy procedures brought on by the Bankruptcy Code demonstrate that Congress did not intend to insert a new value exception into § 1129(b)(2)(B)(ii).
I. Plain Language
A reorganization plan must be “fair and equitable” to be implemented over the objection of an impaired class of creditors. The absolute priority rule helps define what is “fair and equitable” under a reorganization plan. See 11 U.S.C. § 1129(b)(2). A “fair and equitable” plan meets one of two requirements: (1) a class of unsecured creditors must receive property equal to the value of its claim on the effective date of the plan, see § 1129(b)(2)(B)(i), or (2) a dissenting class of unsecured creditors must be fully provided for before any junior class can receive or retain property under the plan, see § 1129(b)(2)(B)(ii) (“the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property”). In this case, the reorganization plan (the “Plan”) does not satisfy the first prong because Bank America will not receive property equal to the value of its $38.5 million deficiency claim on the effective date of the Plan. The Plan also does not satisfy the second requirement — the absolute priority rule — because it permits LaSalle’s partners, whose interests are junior to those of Bank America, to “receive or retain” prop'erty- — ie., the exclusive right to retain their equity interests[1] — -“on account of’ their junior equity interests.
The majority maintains that LaSalle’s partners do not retain a property interest “on account of’ their prior equity interest, but rather “ ‘on account of a new, substan *971 tial, necessary and fair infusion of capital.” Ante, at 964. The majority nonetheless admits, as it must, that “the new investors in the plan can be said to have the opportunity to invest and to control the company ‘on account of their previous relationship with the debtor.” Ante, at 964; see also In re Bonner Mall Partnership, 2 F.3d 899, 909 (9th Cir.1993) (“[I]n some larger sense the reason that former owners receive new equity interests in reorganized ventures is that they are former owners.”), motion to vacate denied and cert. dismissed as moot, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). Despite this concession, the majority asserts that only “[a]s a matter of abstract logic, and ... of semantics,” one can argue that LaSalle’s partners retained property “on account of’ their prior interests, and it further surmises that Congress “might well have intended a more direct causation between the property received by the debtor and the old equity interest.” Ante, at 964; see also Bonner Mall, 2 F.3d at 909 (noting that “[cjausation for any event has many and varied levels” and asserting that Congress surely intended a more “direct or immediate causation”). The majority instead believes that the statute implicitly incorporates a “new value corollary” that permits prior interest holders to retain their interests by infusing new capital into the indebted property. The plain language of § 1129(b)(2)(B)(ii), however, fails to even hint at such a corollary or exception. Indeed, this position hot only belittles the straightforward language of § 1129(b)(2)(B)(ii) but also ignores the application of that language to the facts of this case.
The Plan permits LaSalle’s partners to retain their equity interests “on account of’ two separate factors. LaSalle and the majority opinion correctly assert that LaSalle’s partners retain their ownership interests “on account of’ their new capital contributions. One cannot contest the fact that the partners’ new capital contributions áre one reason why they are able to maintain their ownership of the indebted property. LaSalle’s partners, however, receive this exclusive ownership right only “on account of’ their unique status as prior equity holders. The Plan’s grant of this exclusive right to LaSalle’s partners thus provides a necessary element that causes the prior equity holders to retain their junior interests before the satisfaction of Bank America’s deficiency claim. “Abstract logic” and “semantics” do not suggest this conclusion — the requirements of the Plan and the language of the statute mandate it.
The motivations of LaSalle’s partners magnify this point. They put new capital into the indebted property only so they could postpone the tax losses that they would incur in a foreclosure. In other words, regardless of the new capital contributions provided by LaSalle’s partners, the presence of (and the potential tax liability inherent in) the partners’ prior equity interests motivated the Plan’s inclusion of the partners’ exclusive right to retain their equity interests. The most natural and literal reading of this statute, when applied to the facts of this case, leads one to the inescapable conclusion that LaSalle’s partners are retaining their equity interests “on account of’ their junior interests in the property.
The Fourth Circuit, in In re Bryson Properties, XVIII, 961 F.2d 496 (4th Cir.1992), adopted this very reasoning in rejecting a debtor’s request for application of the new value exception. Id. at 504. Bryson refused to approve a reorganization plan that gave prior equity holders the exclusive right to “ ‘buy’ the [indebted] property without exposing it to the market or otherwise allowing any other party ... the opportunity to bid.” Id. Although the Fourth Circuit did not explicitly hold in so many words that § 1129 does not include a new value exception or corollary, the outcome of the case reveals a strong devotion to the straightforward language of § 1129(b)(2)(B)(ii) and an implicit rejection of the new value exception.[2]
*972 The majority’s reading of the statute effectively inserts the words “solely or primarily” before “on account of’: “the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan SOLELY or PRIMARILY on account of such junior claim or interest any property.” The majority, in other words, qualifies the text of § 1129, and thus permits a departure from an otherwise firm rule that a bankruptcy entity’s assets should be assigned by absolute priority. Perhaps the majority’s reasoning is driven by the fear that a “but for” interpretation would prevent old equity from ever participating in a reorganized entity — something Congress could never have intended. Indeed, such a result would border on the absurd, but a simpler, “but for” causation requirement would not preclude junior interests from participating in a reorganized entity. If prior equity holders earn their shares in an open auction, for example, their received interests would not be “on account of’ their junior interests but “on account of’ their capital contributions. See In re Greystone III Joint Venture, 995 F.2d 1274, 1283 (5th Cir.1991), mthdraum on rehearing (1992) (Judge Jones dissented from the withdrawal of Part IV, which discusses the new value exception); Bryson, 961 F.2d at 504; In re Outlook/Century Ltd., 127 B.R. 650, 654 n. 4 (Bankr.N.D.Cal.1991).
Moreover, the majority opinion fails to consider how its interpretation of the words “on account of’ in § 1129(b)(2)(B)(n) compares to the use of those same words in other parts of the same section. Section 1129(b)(2)(B)(i), for example, provides that a plan is fair and equitable with respect to a class of unsecured claims if “the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value ... equal to the allowed amount of such claim.” 11 U.S.C. § 1129(b)(2)(B)© (emphasis added). In this subsection, “on account of such claim” takes a simple, ordinary “but for” or “because of’ meaning. In other words, § 1129(b)(2)(B)© provides that a plan is fair and equitable with regard to an impaired, unsecured claim if the holder of an unsecured claim receives a value equal to that particular unsecured claim. It would unduly complicate the statute, and indeed make no sense, to insert “primarily or solely” before “on account of such claim” in subsection § 1129(b)(2)(B)®. Congress surely could not have intended such a meaning for that subsection. Nonetheless, the majority seems to think that Congress intended such a meaning for the very same words in the very next subsection. Such a reading of § 1129(b)(2)(B)(ii) ignores the well-established cannon of statutory interpretation that “identical words used in different parts of the same act are intended to have the same meaning.” Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) (quoting several prior Supreme Court cases); see also United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4-5 (1st Cir.1997) (“It is a fundamental interpretive principle that identical words or terms used in different parts of the same act are intended to have the same meaning.... This principle — which the Court recently called ‘the basic cannon of statutory construction’ — operates not only when particular phrases appear in different sections of the same act, but also when they appear in different paragraphs or sentences of a single section.”) (citations omitted), petition for cert. filed, 65 U.S.L.W. 3839 (U.S. June 13, 1997) (No. 96-1987).
Furthermore, I cannot subscribe to the notion that the language of § 1129(b)(2)(B)(ii) must be deemed ambiguous merely because the case law and the academic literature have interpreted it in different ways. The majority relies upon Dewsnup in stating that the “mere recitation of the possible interpretations” of the absolute priority rule renders § 1129’s language ambiguous. Ante, at 964. But Dewsnup and other Supreme Court precedent also command courts to apply a statute’s unambiguous language without looking beyond it. See Dewsnup, 502 U.S. at 419-20, 112 S.Ct. at 779 (“Of course, where the language is unambiguous, silence in the legislative history cannot be controlling.”); Union *973 Bank v. Wolas, 502 U.S. 151, 155-56, 112 S.Ct. 527, 530, 116 L.Ed.2d 514 (1991) (“Given the clarity of the statutory text, respondent’s burden of persuading us that Congress intended to create or to preserve a special rule ... is exceptionally heavy.”); United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240-41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (“[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute.”). As Justice Scalia noted in his dissent in Dewsnup, the Supreme Court has “never held pre-Code practice to be determinative in the face of ... contradictory statutory text.” Dewsnup, 502 U.S. at 433, 112 S.Ct. at 786 (Scalia, J., dissenting).
A natural reading of § 1129(b)(2)(B)(ii) prohibits a junior interest holder from retaining property in the debtor “on account of’ or' “because of’ its status as a prior interest holder. The Plan in this case gives LaSalle’s partners the exclusive right to retain then-ownership interest in the indebted property because of their status as a prior interest holder. Because the straightforward text of the statutory absolute priority rule prohibits such a Plan where there are dissenting, unsecured creditors, I see no need to look beyond the words of the statute.
II. Pre-Code PractiCE
Assuming, arguendo, that the language of § 1129(b)(2)(B)(ii) is ambiguous, a review of the pre-Code bankruptcy practice does not dictate the adoption of the new value exception. In Dewsnup, the Supreme Court noted that Congress did “not write ‘on a clean slate’ ” when amending the bankruptcy laws and that the “Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.” Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. Because nearly everyone agrees that the legislative history “sheds little light” on the vitality of the new value exception, see Bryson, 961 F.2d at 504 n. 13,[3] the majority uses Dewsnup to argue that we must interpret the Code to include the new value exception.
While pre-Code practices have long helped courts interpret ambiguous Bankruptcy Code provisions, they cannot require courts to read unestablished, disputed, or outdated pre-Code principles into the Code. Dewsnup understated its point that Congress does not write on a clean slate when amending the bankruptcy laws because “Congress in fact writes bankruptcy laws on a very messy slate.” In re A.V.B.I., Inc., 143 B.R. 738, 746 (Bankr.C.D.Cal.1992). For that reason, “[[Importing concepts from past reorganization cases into interpretation of the Code must be done gingerly, with proper attention to the context in which the original case arose.” Id.
In Dewsnup, for example, once the Court found the language of 11 U.S.C. § 506 to be ambiguous, its look at the pre-Code practice regarding the involuntary reduction of a creditor’s lien arguably proved to be a fruitful venture. See Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. But see A.V.B.I., 143 B.R. at 744-47 (questioning Dewsnup’s conclusion regarding the established nature of the relevant pre-Code practice). The Dewsnup Court noted that its own cases had not permitted involuntary reductions and that, indeed, such reductions might face constitutional scrutiny under the Takings Clause. See Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. Dewsnup also found legislative history suggesting that Congress intended for § 506(d) to permit liens to pass through bankruptcy unaffected. See id. The Court therefore reasoned that because the bankruptcy laws had , never permitted such a re- *974 duetion of a creditor’s lien, Congress could not have intended to “grant a debtor [a] broad new remedy” without mentioning that remedy in the Code or the legislative history.[4] Id. at 420, 112 S.Ct. at 779.
In the situation of the absolute priority rule, however, a critical look at the pre-Code practice does not reveal Congress’s intent to include a new value exception in § 1129(b)(2)(B)(ii). Rather, the Bankruptcy Code so fundamentally altered the pre-Code reorganization and confirmation procedures that strict adherence to the pre-Code new value exception might contravene Congress’s intent in codifying the absolute priority rule.
The reasonableness of reading the pre-Code new value exception into the codified absolute priority rule is initially harmed by the questionable foundation upon which that exception rests. The Supreme Court’s “creation” of the new value exception in Case v. Los Angeles Lumber Prods., Co., 308 U.S. 106, 121-22, 60 S.Ct. 1, 10-11, 84 L.Ed. 110 (1939), was merely dicta because the Court ultimately ruled that nonmonetary value cannot sufficiently satisfy any type of new value exception. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 203-04, 108 S.Ct. 963, 966-67, 99 L.Ed.2d 169 (1988); Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1361 (7th Cir.1990). In addition, Case never remarked on whether creditors must consent to a plan that permits old equity holders to input new capital in order to retain ownership of the debtor even though the Supreme Court case upon which Case’s dicta relied — Kansas City Terminal R. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926)— presented such a situation. See Kham & Nate’s, 908 F.2d at 1361. Furthermore, the Supreme Court has never upheld the confirmation of a new value plan over a creditor’s objection, see A.V.B.I., 143 B.R. at 743, the Court has expressly stated that the vitality of the new value exception is an open issue, see Ahlers, 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3, and the district and bankruptcy courts are divided on the issue, see J. Ronald Trost, et al., Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, CA46 ALI-ABA 479, 540-43 (1995). “[L]ike .other Supreme Court dicta,” it seems that the “ ‘new value’ exception has taken on a life of its own in the lower courts.” A.V.B.I., 143 B.R. at 743 (citing John D. Ayer, Rethinking Absolute Priority After Ahlers, 87 Mich. L.Rev. 963, 1016, (1989)); see also Kham & Nate’s, 908 F.2d at 1360 (“So far as the Supreme Court is concerned, however, the development [of the new value exception] has been 100% dicta.”). And unlike Dewsnup, there is no express legislative history suggesting that Congress intended the exception to survive.
Moreover, the bankruptcy law principles underlying the “creation” and “development” of the new value exception differ greatly from those under the present Bankruptcy Code. Prior to the enactment of the Code in 1978, bankruptcy law consisted of a number of provisions differing from each other regarding the confirmation of reorganization plans and the existence of “fair and equitable” standards in those situations. In Case, for example, Section 77B of the Bankruptcy Act of 1898 required that creditors unanimously consent to a debtor’s reorganization plan and that the plan meet a “fair and equitable” standard developed under the common law. See Case, 308 U.S. at 114-15, 60 S.Ct. at 6-7; Kham & Nate’s, 908 F.2d at 1360-61. Section 77B, which lasted only 4 years, quickly gave way to Chapters X and XI of the Bankruptcy Act. 7 Collier on Bankruptcy, ¶ 1129.04[4][e], at 1129-105 (Lawrence P. King ed., 15th rev. ed.1997). Chapter X retained Section 77B’s “fair and equitable” requirement, and it mandated the appointment of a disinterested trustee to control the reorganization of the debtor. Id. ¶ 1129.04[4][c], at 1129-106.[5] Chapter XI included a “fair and equitable” rule when enacted in 1938, but that concept was re *975 pealed from Chapter XI in 1952. Id. ¶ 1129.04[4][b], at 1129-92 n. 105.[6]
' The enactment of the Bankruptcy Code in 1978, however, fundamentally changed this bankruptcy backdrop. Chapter 11 of the Code “reflects a melding of concepts derived from several [of these and other] distinct bodies of pre-Code law” combined with the “conscious purpose ... to create a new chapter that represented the best of all these approaches to reorganization.” A.V.B.I., 143 B.R. at 746-47. Significantly, the Code eliminated the unanimous consent requirement among creditors, see 11 U.S.C. § 1126(c), and it required a “fair and equitable” test whenever an impaired class of creditors rejects a reorganization plan, see 11 U.S.C. § 1129(b)(1). The Code, moreover, provided the first codification of this “fair and equitable” test. See 11 U.S.C. § 1129(b)(2). The present, increased flexibility in confirming reorganization plans coupled with new codifications thus represents a significant change from pre-Code bankruptcy law and arguably renders the new value exception unnecessary. See Greystone III, 995 F.2d at 1282, 1285 (Jones, J., dissenting).
Current bankruptcy practice also differs from pre-Code practice because most Chapter 11 cases are now operated by debtors-in-possession rather than court-appointed trustees. See A.V.B.I., 143 B.R. at 743. When the Court decided Case, a new value exception to the absolute priority rule may not have been objectionable to creditors because the court-appointed trustee would presumably sell the property back to the equity holders only after it “examined the books and operations” and had not “unearthed any dishonesty or mismanagement.” Id. The present Chapter 11 framework, however, “permits uninterrupted control by insiders,” and therefore creates situations where creditors fear that the reorganizations “are run for the private benefit of existing salaried management and the equity holders, with the intent of unfairly squeezing out the creditors.” Id.
The enactment of the Code further altered prior bankruptcy practice by removing bankruptcy judges’ “equitable powers to modify contracts to achieve ‘fair’ distributions.” Kham & Nate’s, 908 F.2d at 1361. “[W]hat-ever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.” Ahlers, 485 U.S. at 206, 108 S.Ct. at 969. The notion that the Code, rather than equitable principles, permits a non-consensual plan to “sell” the indebted property, to its old owners flies in the face of Chapter 11 and Ahlers: “The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents’ reorganization plan’ was confirmed. But that determination is for the creditors to make in the manner specified by the Code.” Ahlers, 485 U.S. at 207, 108 S.Ct. at 969; see also id. (providing that “it is up to the creditors — and not the courts — to accept or reject a reorganization plan which ... fails to honor the absolute priority rule”). “In effect, Section 1129(b)(2)(B) of the Code gives the creditors — not the court — the right to decide whether to waive the absolute priority rule.” A.V.B.I., 143 B.R. at 744.
In light of the elimination of the unanimous consent requirement, the current trend of operation by debtors-in-possession, and the decrease of bankruptcy courts’ equitable powers, retaining the “new value exception” arguably gives debtors a “broad new remedy” — exactly the sort of balance-upsetting interpretation that Dewsnwp rejected. The present case is therefore more like Wolas than Dewsnwp.
The debtor in Wolas maintained that 11 U.S.C. § 547(c)(2), which makes an exception to the rule authorizing a trustee to avoid certain property transfers made by a debtor within ninety days before bankruptcy, did not apply to payments on long-term debt. Although the text of § 547(c)(2) did not distinguish between long-term debt and short-term debt, the debtor argued, among other things, that Congress intended to codify the *976 pre-Code “current expense” rule, which would ultimately limit § 547(c)(2)’s exception to short-term debt. Wolas, 502 U.S. at 158-59, 112 S.Ct. at 531-32. The Court rejected this argument, reasoning that there was no extrinsic evidence or legislative history suggesting that Congress intended to codify the current expense rule. Id. at 159 & n. 14,112 S.Ct. at 532 & n. 14. Significantly, the Court also noted that the Code substantially enlarged the trustee’s power to avoid preferential transfers, and that it could not “assume that the justification for narrowly confining the ‘current expense’ exception” to certain situations before the enactment of the Code should apply to an exception in the Code. Id. at 160, 112 S.Ct. at 532. Rather, “the fact that Congress carefully reexamined and entirely rewrote the preference provision in 1978 supports the conclusion that the text of § 547(e)(2) as enacted reflects the deliberate choice of Congress.” Id. at 160, 112 S.Ct. at 532; see also id. at 160 n. 15, 112 S.Ct. at 532 n. 15 (citing the legislative history and noting that Congress intended to undo the “hopelessly complex” pre-Code preference section by proposing a “unified and coherent section to deal with the problems created by pre-bankruptcy preferential transfers”). In our case, as in Wolas, Congress significantly changed the underlying law upon which the pre-Code absolute priority rule and new value exception relied by creating a new Chapter 11 to deal with reorganization procedures and requirements.
Keeping in mind the significant differences in the pre-Code bankruptcy environment, strict adherence to a tenuous pre-Code practice makes little sense. Even if Dewsnup repudiated prior bankruptcy statutory interpretation cases like Wolas and Ron Pair and effectively mandated a review of pre-Code practice in any case where the parties disagree on the . meaning of the statute’s language, see Dewsnup, 502 U.S. at 435, 112 S.Ct. at 787 (Scalia, J., dissenting) (“I have the greatest sympathy for the Courts of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case.”), the pre-Code rationale for the new value exception makes little sense in today’s Chapter 11 environment. The majority, due to its uncritical adherence to Dewsnup, creates an anachronism by cutting and pasting pre-Code practice into a fundamentally different bankruptcy context. As a result, we are left with a new § 1129(b)(2)(B)(ii) that Congress likely never intended. For that reason, I must dissent from the majority’s otherwise solid opinion.[7]

. A debtor’s exclusive right to receive or retain an equity interest is property for purposes of the new value exception and the absolute priority rule. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207-08, 108 S.Ct. 963, 969-70, 99 L.Ed.2d 169 (1988) ("Even where debts far exceed the current value of assets, a debtor who retains.his equity interest in the enterprise retains property.' "); In re Bryson Properties, XVIII, 961 F.2d 496, 504 (4th Cir.1992) (“This exclusive right to contribute constitutes 'property' under § 1129(b)(2)(B)(ii), which was received or retained on account of a prior interest.”); Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1360 (7th Cir.1990) (“An option to purchase stock also is 'property.' ”); see also Ahlers, 485 U.S. at 208, 108 S.Ct. at 969 (“[Wlhile the Code itself does not define what 'property' means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad.").

. Contrary to the majority’s suggestion that the courts of appeals that have addressed this issue have all ruled that the new value exception did survive the enactment of the Bankruptcy Code, see ante, at 966 & n. 13, Bryson s outcome and analysis reveal that the circuits are not in agreement on the issue. The Ninth Circuit has conducted perhaps the most exhaustive discussion of the issue to date, and it determined that the new value exception remains viable. See Bonner Mall, 2 F.3d at 899. The Sixth Circuit also recognized, without discussion, the existence of the new value exception. See In re U.S. Truck Co., 800 F.2d 581, 588 (6th Cir.1986). A Fifth Circuit panel, however, originally concluded that the new value exception did not survive the en *972 actment of the Code, see In re Greystone III Joint Venture, 995 F.2d 1274, 1281-84 (5th Cir.1991), withdrawn on rehearing (1992); two members of that panel later voted to withdraw the part of the opinion that dealt with the new value exception, apparently in response to Dewsnup. Id. at 1284-85 (Judge Jones dissented from the removal of the new value exception analysis.).

. In this circuit, we have speculated inconclusively on the meaning of the sparse legislative history. Some cases have suggested that Congress’s rejection of a proposal by the Bankruptcy Commission to modify the absolute priority rule and its exceptions reveals that Congress did not intend to include such an exception when enacting the Code. See, e.g., Kham & Nate’s, 908 F.2d at 1361-62 (noting that Congress was aware of the rule and its exceptions when it adopted the "blanket” absolute priority rule without "suggest[ing] a single exception”). Other cases have pointed out, however, that the proposed (but rejected) rule sought to ease the requirements of the new value exception, and thus the "rejection of the modification could just as easily be construed as an endorsement of the status quo.” In re Snyder, 967 F.2d 1126, 1130 (7th Cir.1992).

. Justice Scalia's dissent in Dewsnup contends, however, that the language of § 506(a) & (d) unambiguously granted such a remedy. See Dewsnup, 502 U.S. at 420, 112 S.Ct. at 779.

. Under Chapter X, no shareholder ever convinced a court that it contributed sufficient value to retain an interest under the new value concept, and no reported case expressly adopted Case's new value dicta as its holding until the Code’s enactment in 1978. 7 Collier on Bankruptcy, ¶ 1129.04[4][c], at 1129-107.

. Because the absolute priority rule no longer applied to Chapter XI proceedings after 1952, cases under that chapter d]d not address any new value issues. 7 Collier on Bankruptcy, ¶ 1129.04[4][c], at 1129-106 to 1129-107; see also id. ¶ 1129.04[4][a], at 1129-84 to 1129-85. The number of parties that could potentially seek application of new value principles further declined due to a preference for filing under Chapter XI rather than Chapter X, which is partially explained by Chapter X’s disinterested trustee requirement. Id. ¶ 1129.04[4][c], at 1129-106.

. In furthering its reasoning, the majority lists the significant advantages gained by the existence of a new value exception to the statutory absolute-priority rule. Ante, at 20-21; see also Bonner Mall, 2 F.3d at 915-16; Snyder, 967 F.2d at 1130. Much ink has already been spilled debating the benefits and detriments of the new value exception in the context of Chapter 11, and my opinion will likely add little to the debate. I do, however, feel that the majority's policy arguments should not go unanswered.
Without question, the ability to infuse new capital from old equity holders provides a valuable tool for reorganizations. The creditors; however, should be able to make the ultimate decision regarding whether to incorporate such new value. See Greystone III, 995 F.2d at 1284, 1285 (Jones, J., dissenting) (“It is dubious to suppose that courts will ordinarily possess superior foresight than the creditors themselves concerning the creditors’ best interests.”). Rejection of the new value exception, moreover, will not extinguish "new value” as a beneficial tool for reorganization. See Bryson, 961 F.2d at 504 (noting that if a "plan represents a reasonable business risk, creditors should be willing to fore-go immediate recoveries in exchange for the expectation of greater recoveries in the future, in which case they would consent to viable plans providing for new capital infusions"). Creditors regularly consent to new value plans, see A.V.B.I., 143 B.R. at 743, and they will continue to do so even when they are not faced with the threat of a cramdown, see Kham & Nate’s, 908 F.2d at 1360 (noting that creditors effectively own bankrupt firms and that in many instances the creditors should be willing to consent to a voluntary plan that allows old equity holders to gain stock in return for inputting new value). Finally, providing this power to creditors alone, and removing it from the courts, will provide the incidental benefit of removing an "enormously complicating factor” from the "carefully balanced bargaining structure” used to formulate consensual reorganization plans. Greystone III, 995 F.2d at 1283-84, 1285 (Jones, J., dissenting); cf. Bonner Mall, 2 F.3d at 917 (discussing, the need for bankruptcy courts to "carefully apply” the strictures of the new value exception in order to prevent old equity from circumventing the purpose of the absolute priority rule).