126 F.3d 955
 67 USLW 3483, 38 Collier Bankr.Cas.2d 1275,
31 Bankr.Ct.Dec. 658, Bankr. L. Rep. P 77,529
 In the Matter of 203 N. LASALLE STREET PARTNERSHIP, an
Illinois Limited Partnership, Debtor-Appellee,
Appeal of: BANK OF AMERICA ILLINOIS, Appellant.
 Nos. 96-2137, 96-2138.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 6, 1996.
Decided Sept. 29, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied Nov. 25, 1997.*
 
 Thomas s. Kiriakos (argued), James C. Schroeder, Beverley J. Klein, Mayer, Brown & Platt, Chicago, IL, for Appellant.
 Richard M. Bendix, Jr. (argued), Bret A. Rappaport, Paul J. Gaynor, Schwartz, Cooper, Greenberger & Krauss, Chicago, IL, Mark Wilkow, Chicago, IL, for Debtor-Appellee.
 Before CUMMINGS, RIPPLE and KANNE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 This case involves Bank of America Illinois' ("Bank America") appeal of the confirmation of a bankruptcy reorganization plan. 203 N. LaSalle Street Limited Partnership ("LaSalle"), which owns fifteen floors of office space in a Chicago building, failed to pay a secured note held by Bank America, and Bank America attempted to foreclose on the property. LaSalle filed for bankruptcy under Chapter 11, 11 U.S.C. § 1101 et seq. LaSalle eventually filed a reorganization plan that the bankruptcy court approved, as modified, despite Bank America's opposition to the plan. The district court upheld the bankruptcy court's order confirming the plan. For the reasons set forth in the following opinion, we affirm the judgment of the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 The debtor in this case, LaSalle, is an Illinois limited partnership that owns fifteen floors of office space in a building in the central business district of Chicago. The property was encumbered by a lien in favor of Bank America; LaSalle owed Bank America more than $93 million. LaSalle's loan was secured by a first non-recourse mortgage on the property that came due on January 3, 1995. LaSalle was unable to repay the loan, so Bank America started a foreclosure action in state court on January 20, 1995. In response, LaSalle filed for bankruptcy under Chapter 11. Bank America elected to have its secured claim, which was significantly greater than the value of the security, treated as a secured claim and an unsecured claim under 11 U.S.C. § 1111(b).[1] In addition to the debt held by Bank America, LaSalle had several other debts outstanding: One of the general partners held a second non-recourse mortgage on the property; $2.3 million in real estate taxes remained unpaid; and other non-inside creditors held $90,000 in trade claims.[2] In addition to the property, LaSalle held the right to a cash account consisting of pre-petition rents that amounted to $3.1 million. By filing for bankruptcy rather than having Bank America foreclose on the property, LaSalle's partners postpone significant tax liabilities estimated at $20 million.
 
 
 4
 Before the bankruptcy court, the debtor filed a plan for reorganization on April 13, 1995, which it amended on May 12. Bank America objected to the amended plan, and the bankruptcy court rejected it because, in the court's view, the plan was not feasible. LaSalle further revised the plan and filed another reorganization plan on September 11, 1995. Under the new plan, Bank America was the only party to object, and at least one impaired class of claims, the unsecured trade debt class, voted to approve the plan. The bankruptcy court conducted a hearing and confirmed the plan (with slight modification).[3] In its thorough opinion, the bankruptcy court found that the plan met all of the necessary requirements under 11 U.S.C. § 1129. It therefore confirmed the plan, finding the value of the property at that time to be $55.8 million.
 
 
 5
 Under the confirmed plan, the debtor's partners would contribute new capital: $3 million the day after the effective date of the plan and five annual installments of $625,000 thereafter. LaSalle would pay the non-insider trade creditors in full without interest. Upon confirmation, the insiders would waive their general unsecured claims. The priority and state tax claims under the plan would be paid within 30 days of approval. Bank America's secured claim ($54.5 million)[4] would be paid partly in cash, $1.1 million within 5 days of the effective date of the plan, and the rest as a 7-10 year interest-bearing note secured by the property. Monthly payments would be made on a 30-year amortization schedule, and any excess payments would be applied to the principal. At the end of that time, if the property were sold or refinanced, any additional proceeds, after the secured claim is paid, would be applied toward Bank America's unsecured claim, $38.5 million. The plan also provided that, in the case of default, the debtor's deed held in escrow would be conveyed to Bank America.
 
 B. District Court Proceeding
 
 6
 Bank America appealed the bankruptcy court's confirmation of LaSalle's reorganization plan to the district court and raised 14 objections. The district court reviewed Bank America's objections and upheld the decision of the bankruptcy court in its entirety. The district court rejected Bank America's objection that the plan was not proposed in good faith, as required by § 1129(a)(3), because that provision focuses on the content and effect of the plan, not the subjective motivation of the plan's proponent. The court further reasoned that, even if § 1129(a)(3) were concerned with the filer's motivation, here the avoidance of tax consequences, LaSalle's proposal was not filed in bad faith. The district court also found that the bankruptcy court's factual findings that the plan was accepted by an actual impaired class, as required by § 1129(a)(10), was not clearly erroneous. The district court agreed with the bankruptcy court that the plan met § 1129(a)(7)(A)'s "best interest" test because, under the proposed plan, Bank America receives property of a value not less than the amount Bank America would receive if the debtor had proceeded under Chapter 7: The present value of the plan for the secured claim is the same under the plan as Bank America would receive in a Chapter 7 liquidation. In addition, Bank America's deficiency claim, its unsecured claim, is treated more favorably under the proposed plan than under Chapter 7 because, under Chapter 7, Bank America would have received nothing for its unsecured deficiency claim. Further, according to the court, because the best interest test is met and the plan is carefully tailored to fulfill the requirements of that test, the plan does not unfairly discriminate against Bank America. Indeed, said the court, the discrimination from which Bank America claimed to suffer--other unsecured claims are paid off 100%, but Bank America gets only 16% of its unsecured claim--is not unfair. The district court agreed with the bankruptcy court that the Bankruptcy Code did not abolish the Bankruptcy Act's "new value" corollary to the absolute priority rule. In addition, the district court agreed with the bankruptcy court that the requirements for the new value corollary were met in this case. Therefore, the court found, the property held by the partners under the proposed plan did not violate the absolute priority rule. The court also upheld the bankruptcy court's determination that, despite the potential cash shortfalls in years 7 and 8 of the plan, the plan was feasible. Finally, the district court upheld the bankruptcy court's finding that the plan was fair and equitable in its treatment of Bank America's unsecured claim; the plan therefore met § 1129(b)(2)'s "cramdown" requirements. The district court, in short, upheld the bankruptcy court in toto, and Bank America appeals.
 
 II
 DISCUSSION
 
 7
 For a reorganization plan to be confirmed, the plan must meet the requirements of 11 U.S.C. § 1129.[5] Bank America makes many of the same arguments to us that it did on appeal to the district court. Bank America alleges that the plan should not have been confirmed because it did not meet a number of § 1129's requirements. Success on the merits of any one of these claims would dictate a reversal of the bankruptcy court's confirmation order, unless, as LaSalle maintains, the appeal is moot. We shall deal with each of these issues in turn.
 
 
 8
 However, before we turn to the specifics of the case, a quick overview of the process for the confirmation of a reorganization plan may prove useful. For a bankruptcy court to approve a proposed reorganization plan, the plan's proponent must show that the plan satisfies the 13 requirements of § 1129(a), if they are applicable. With one exception, to be discussed, a plan must meet all 13 requirements. They are: (1) the plan's compliance with Title 11, (2) the proponent's compliance with Title 11, (3) the good faith proposal of the plan, (4) the disclosure of payments, (5) the identification of management, (6) the regulatory approval of rate changes, if applicable, (7) the "best interest" test, (8) the unanimous acceptance by impaired classes, (9) the treatment of administrative and priority claims, (10) the acceptance by at least one impaired class of claims, (11) the feasibility of the plan, (12) the bankruptcy fees, and (13) retiree benefits. See 11 U.S.C. § 1129(a)(1)-(13). If, however, a plan is not approved by all of the impaired classes, as generally required by 11 U.S.C. § 1129(a)(8), it is still possible for a plan to be confirmed. If at least one of the non-insider, impaired classes of claims approves the plan, then a plan may be confirmed if two additional requirements are met. See 11 U.S.C. § 1129(b). If the bankruptcy court finds that all of the applicable requirements of § 1129(a) are met except for § 1129(a)(8), and also that the plan does not discriminate unfairly between impaired classes and is fair and equitable to the rejecting classes, then the court may confirm the plan. See 11 U.S.C. § 1129(b)(1)-(2).
 
 
 9
 In our review of the district court and bankruptcy court decisions, we review both courts' conclusions of law de novo. In re Chappell, 984 F.2d 775, 779 (7th Cir.1993). We review the determinations of fact by the bankruptcy court for clear error. In re Andreuccetti, 975 F.2d 413, 419-20 (7th Cir.1992). A " 'finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " FDIC v. Bierman, 2 F.3d 1424, 1431 (7th Cir.1993) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)) (internal quotation and citation omitted).
 
 A. Mootness
 
 10
 As a preliminary matter, we must respond to LaSalle's contention that the appeal should be dismissed as moot. LaSalle submits that, because the reorganization plan has been confirmed and LaSalle has implemented the plan, it would be very difficult now to reverse all the necessary transactions without harming a number of innocent third parties. Specifically, LaSalle contends: Investors have already put their capital into the reorganized debtor (thus foregoing other investment opportunities); LaSalle has renegotiated a lease with one of its two largest tenants; that tenant has spent a significant amount of money to redecorate its leased space; and numerous other payments have been made. In short, LaSalle concludes, under the circumstances, it would be very difficult for the bankruptcy court to "unscramble the eggs" now.
 
 
 11
 The mere fact that Bank America was unable to obtain a stay from either the district court or this court does not necessarily lead to the conclusion that, once the plan has been confirmed and implemented, all issues related to the confirmation of the plan are moot. See In re Envirodyne Indus., 29 F.3d 301, 303-04 (7th Cir.1994); In re Andreuccetti, 975 F.2d at 418. In In re Envirodyne, we held that a court's ability to provide at least partial relief satisfies the Article III mootness issue. 29 F.3d at 303-04. With respect to the principle that courts will frequently refuse to modify a bankruptcy plan if it has already been implemented (formerly known as the "equitable mootness" doctrine), we noted that our inquiry is "whether modification of the plan of reorganization would bear unduly on the innocent." Id. at 304; cf. In re Lloyd, 37 F.3d 271, 273 (7th Cir.1994) (holding in bankruptcy proceeding that, because court could fashion some relief for the debtor, appeal was not moot, despite estate's sale of property to good faith purchaser). "So if modification of a plan of reorganization would upset legitimate expectations, it may be refused...." In re Envirodyne, 29 F.3d at 304 (emphasis added).
 
 
 12
 Many of the transactions that have occurred to date easily can be reversed without significant harm to third parties. Bank America seeks to foreclose on the property; doing so would not affect the monies that the trade creditors and state taxing authority have received. Bank America also does not seek to reverse the lease agreement reached between LaSalle and its tenant. Moreover, Bank America has agreed to return any payments and documents to LaSalle necessary to reverse the transaction. Finally, Bank America has consented to repay to the investors their investments plus reasonable interest. We believe that, if we were to reverse the decisions of the district and bankruptcy courts, the bankruptcy court could fashion some form of relief that would not unduly burden innocent third parties. Therefore we, like the district court, do not agree with LaSalle that the appeal is moot.
 
 B. Feasibility
 
 13
 Bank America insists that the plan fails to meet the feasibility requirement of § 1129(a)(11), which requires that, in order for a plan to be confirmed, the "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor...." 11 U.S.C. § 1129(a)(11). In determining that the plan was feasible, the bankruptcy court need not find that it is guaranteed to succeed; "[o]nly a reasonable assurance of commercial viability is required." In re T-H New Orleans Ltd. Partnership, 116 F.3d 790, 801 (5th Cir.1997) (brackets in original); accord In re Acequia, Inc., 787 F.2d 1352, 1364 (9th Cir.1986); In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir.1985). Bank America, in arguing that the plan will not succeed, focuses on years 7 and 8 of the plan. In those years, LaSalle expects that it will experience cashflow shortfalls.
 
 
 14
 The bankruptcy court scrutinized the plan very carefully and, despite these shortfalls, determined that the plan was feasible. It reasoned that the cashflow under the plan would be sufficient to pay all the debtor's expenses and the debt service to the bank for the first six years of the plan. By that time, the bankruptcy court concluded, LaSalle will have paid down the principal on the note by $7.5 million. In years 7 and 8 of the plan, however, there will be some cashflow shortages because of likely costs expended to renew the lease of one of the major tenants in the property. In years 9 and 10, the court predicted, projected cashflow will again exceed expenses and debt service. This cashflow shortfall would not make the plan unfeasible, stated the court, because it was likely that, after six years of successful implementation of the plan, Bank America voluntarily would lend the needed capital to LaSalle. If, on the other hand, the bank at that time decided not to lend LaSalle the money, LaSalle could sell its interest in the property and prepay the balance of the loan. The bankruptcy court, after hearing expert testimony on the improving market for office space in Chicago's central business district, determined that, at the time of the cashflow shortfall, the value of LaSalle's property would significantly exceed the remaining principal on the secured debt. Alternatively, the court found that, even if LaSalle did not make up the shortfall, there would not be a liquidation. Under the plan, if Bank America refuses to lend LaSalle the necessary capital and LaSalle does not sell its property, LaSalle will automatically and voluntarily transfer the property to Bank America.
 
 
 15
 Bank America forwards three points that, it insists, undermine the bankruptcy court's conclusion that the plan is feasible. First, Bank America argues that the success of the plan depends upon the bank's willingness to re-lend money to LaSalle. Second, Bank America contends that, although there was expert testimony on which the court relied about the improving real estate market in the central business market in general, there was no testimony of an improving market for this specific property. Finally, Bank America asserts that the automatic reconveyance of the property to the bank in the event of LaSalle's default does not sufficiently protect Bank America's interest because a potential future bankruptcy proceeding could invalidate the conveyance.
 
 
 16
 We agree with the district court, which, when considering the same arguments on appeal, concluded that these concerns are "primarily hypothetical, and constitute merely disagreements with the inferences drawn by the bankruptcy court." Bank of America, Illinois v. 203 N. LaSalle Street Partnership, 195 B.R. 692, 710 (N.D.Ill.1996). Contrary to Bank America's assertions, the bankruptcy court did not conclude that the success of the plan required Bank America to re-lend LaSalle capital in years 7 and 8 of the plan, although the court concluded that such a transaction would be the most likely outcome. Instead, the court considered alternatives that would not violate the § 1129(a)(11) requirement even if Bank America were not to re-lend capital to LaSalle. We do not think that the bankruptcy court's conclusion on this point is clearly erroneous. We also do not believe that the inference the bankruptcy court drew about the future marketability of LaSalle's property by relying on expert testimony concerning the future real estate market in the property's vicinity, rather than requiring expert predictions with respect to the future market solely for LaSalle's property, was clearly erroneous. A plan need not be assured of success to be confirmed. We cannot accept Bank America's submission that the bankruptcy court's decision on this point was clearly erroneous.
 
 C. New Value Corollary
 1.
 
 17
 The general rule for a reorganization plan that has not been approved unanimously by the impaired classes is that it must meet the strictures of the absolute priority rule to be approved.[6] The Supreme Court of the United States has summarized the absolute priority rule as follows: "[A] dissenting class of unsecured creditors must be provided for in full before any junior classes can receive or retain any property under a reorganization plan." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (internal quotation and brackets omitted).
 
 
 18
 Prior to the passage of the Bankruptcy Code, there was a corollary to this rule, the "new value" corollary. See In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1314 (7th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996). Under the new value corollary, established by Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), a junior claim holder (an equity interest holder, for example) may retain, in some circumstances, his equity interest in the property over the objection of a senior impaired creditor class. To do so, the junior interest holder, under the proposed plan, must contribute new capital to the restructured enterprise. That capital must be new, substantial, necessary for the success of the plan, reasonably equivalent to the value retained, and in the form of money or money's worth. In re Woodbrook Assocs., 19 F.3d 312, 319-20 (7th Cir.1994). The Supreme Court has noted that this corollary is rooted in the pragmatic realization that, in the course of a reorganization, "additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them, unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them." Kansas City Terminal Ry. v. Central Union Trust Co., 271 U.S. 445, 455, 46 S.Ct. 549, 552, 70 L.Ed. 1028 (1926).
 
 
 19
 In enacting the Code, Congress codified the absolute priority rule, § 1129(b)(2)(B)(ii), by providing that a plan's treatment of the creditors would be fair and equitable if
 
 
 20
 the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
 
 
 21
 11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). At the same time, the Code altered the scheme of plan confirmation to provide that a plan could be confirmed if at least one of the impaired non-insider classes of creditors votes to approve the plan. The court then must confirm the plan if it finds that the plan does not discriminate unfairly and is "fair and equitable" to each dissenting class. See 11 U.S.C. § 1129(b)(2).
 
 
 22
 At the time it codified the absolute priority rule, Congress did not explicitly codify the new value corollary. In re Woodbrook, 19 F.3d at 320. Neither we nor the Supreme Court has had occasion to determine definitively whether this new value exception survived passage of the Bankruptcy Code. See In re Wabash, 72 F.3d at 1315.[7]
 
 
 23
 Both the bankruptcy court and the district court concluded that the new value corollary did survive passage of the Code. Based upon its conclusion, the bankruptcy court determined that LaSalle's plan did not violate § 1129(b)(2)'s absolute priority rule because LaSalle's plan met the requirements of the new value corollary. Bank America contends that the courts erred on both counts: First, the new value exception is no longer viable; second, even if still valid, LaSalle's plan did not meet the requirements of the exception.
 
 
 24
 We begin, as we must with every statutory interpretation question, with the wording of the statute. Bank America reads § 1129(b)(2)(B)(ii) to require, by the very force of the language itself, the repeal of the new value corollary. As we have noted earlier, this statutory provision provides that a junior interest may not receive any property in a reorganization "on account of" its previous interest before an objecting impaired senior creditor is paid in full. Under this reading of the statute, Bank America contends that, even assuming that LaSalle's reorganization plan meets the requirements of the new value exception, confirmation of the plan violates the statutory language. LaSalle's old equity interest holders, whose claims are junior to those of Bank America, are receiving or retaining property, the ability to continue to run their business, "on account of" their old equity interest.
 
 
 25
 This interpretation requires, of course, that the phrase "on account of" bear a great deal of weight. As a matter of abstract logic, and certainly of semantics, one can argue that such a meaning can be attributed to these three words. At some level of abstraction, the new investors in the plan can be said to have the opportunity to invest and to control the company "on account of" their previous relationship with the debtor. However, the phrase is also susceptible of another construction. Congress, in using the "on account of" language, might well have intended a more direct causation between the property received by the debtor and the old equity interest. It can be cogently reasoned that, when an old equity holder retains an equity interest in the reorganized debtor by meeting the requirements of the new value corollary, he is not receiving or retaining that interest "on account of" his prior equitable ownership of the debtor. Rather, he is allowed to participate in the reorganized entity "on account of" a new, substantial, necessary and fair infusion of capital.
 
 
 26
 The mere recitation of the possible interpretations of the statutory absolute priority rule, interpretations argued and reargued in both the cases and the academic literature,[8] evidence the ambiguity of the provision. See Dewsnup v. Timm, 502 U.S. 410, 416, 112 S.Ct. 773, 777-78, 116 L.Ed.2d 903 (1992) (noting that the contrasting positions of the parties with respect to section 506 and its relationship to other parts of the Code "do embrace some ambiguities"). We therefore must look beyond the statutory language.
 
 
 27
 The Supreme Court has made it clear that, in interpreting the Bankruptcy Code, we must keep in mind that "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate.' " Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779 (quoting In re John M. Russell, Inc. (Emil v. Hanley), 318 U.S. 515, 521, 63 S.Ct. 687, 690-91, 87 L.Ed. 954 (1943)). The Court has been "reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." Id. (citing United Savings Ass'n v. Timbers of Inwood Forest Associates, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). As we have noted, for more than fifty years, the new value precept has been recognized as an important corollary or exception to the absolute priority rule. See In re Snyder, 967 F.2d 1126, 1128 (7th Cir.1992). " '[I]f Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. The Court has followed this rule with particular care in construing the scope of bankruptcy codifications.' " In re Snyder, 967 F.2d at 1129 (quoting Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection, 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986)) (brackets in original). In short, the Supreme Court has told us that we are not to abandon past bankruptcy practices absent a clear indication that Congress intended to break from those practices. "We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure." Pennsylvania Dep't Pub. Welfare v. Davenport, 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990).
 
 
 28
 In this case, there can be no question that "Congress must have enacted the Code with a full understanding" of the absolute priority rule and its new value corollary. Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. As this court has detailed on a prior occasion, see In re Snyder, 967 F.2d 1126, 1129 (7th Cir.1992), the new value corollary has long been ensconced in our bankruptcy practice. Indeed, it has been noted in several Supreme Court cases.[9] There was even a proposal before Congress to expand the scope of the new value corollary by eliminating the requirement that the new capital to be provided be in money or money's worth.[10] Yet, despite its awareness of the major role that the new value exception traditionally has played in the bankruptcy field, Congress never explicitly declared, either in the text or in the legislative history of the statute, that it intended the abolition of this important tool.
 
 
 29
 Of the two textual interpretations, we think that the far more plausible is the one that interprets the "on account of" language to permit the continued existence of the new value corollary. We think that it is more reasonable to believe that Congress legislated on the understanding that, in new value transactions, old equity owners receive stock in exchange for the additional capital they invest. This interpretation is far more reasonable in terms of the practical realities of bankruptcy administration than the highly conceptualistic suggestion that the opportunity to participate in the reorganization is itself property retained on account of an old equity holder's prior ownership interest. As a practical matter, the opportunity to participate in a reorganization plan, even an exclusive right, is not retained on account of an old equity holder's former ownership interest; the opportunity to give new value and to have the opportunity to receive a return on that capital infusion is given because such participation, even exclusive participation, may enhance the value of the business after reorganization. Indeed, exclusivity may be necessary simply because it may be easier to obtain additional funding from the old equity participants.
 
 
 30
 The new value corollary has been a major source of new funding in reorganizations for the past fifty years. To assume that Congress abolished this device implicitly by the three words "on account of" is to assume that Congress made a major economic decision affecting the economic health, and indeed the continued existence, of many corporate entities without ever addressing squarely the issue in the statute or its legislative history. The Code does provide some flexibility in plan confirmation in the face of dissenting creditors by denying minority dissenting creditors the right to prevent confirmation as long as the requisite majority of the creditors in each class accepts the plan. To the extent that the new value corollary was, in pre-Code days, a device that gave the plan proponent some leverage in dealing with minority creditors, its necessity may not be as great today as it was in an earlier period.[11] Nevertheless, the new value corollary still serves as a significant source of new funding for the ailing entity,[12] and one would expect that Congress would address deliberately such a significant issue of economic policy if it had determined to abolish it. Notably, Congress gave not one hint, in the text of the statute or its legislative history, that it viewed the new measures regarding the participation of creditors in the approval of the plan to be connected to the continued availability, or the demise, of the new value corollary.
 
 
 31
 To declare the abolition of the new value corollary would require us to take one of several paths, all of which would be inconsistent with the directions of the Supreme Court of the United States. We could hold that the statutory version of the absolute priority rule is unambiguous in its rejection of the new value corollary and disregard the great body of judicial opinions and serious scholarship that has contended for a variety of interpretations. Alternatively, we could acknowledge the provision's ambiguity but disregard the clear direction of the Supreme Court that we are not lightly to infer that Congress has altered by implication established bankruptcy practice. Rather than embark on either of these precarious routes, we shall join the other circuits[13] that have decided the issue and hold that the new value corollary remains a part of our bankruptcy jurisprudence.
 
 2.
 
 32
 Bank America further submits that, even if a new value exception were to exist under the Code, the debtor's plan here did not meet its requirements because the amount of capital infused was not substantial. The bankruptcy court found that the plan proposed infusing new capital into the reorganized debtor. The new capital, the court determined, amounted to a present-value money equivalent of $4.1 million. The bankruptcy court also concluded that this capital was necessary for the success of the plan, was in money or money's worth, was reasonably equivalent to the interest retained, and was substantial. Thus, according to the bankruptcy court, the plan met the requirements of the new value corollary and did not violate the absolute priority rule.
 
 
 33
 We review these findings by the bankruptcy court for clear error. In re Andreuccetti, 975 F.2d 413, 419-20 (7th Cir.1992). "Whether the infusion of new capital is 'substantial' is more a common sense determination than a mathematical calculation when the debtor comprises only a single real estate asset which is fully encumbered." In re Woodbrook, 19 F.3d 312, 320 (7th Cir.1994); accord In re Snyder, 967 F.2d 1126, 1131-32 (7th Cir.1992) ("There is no mathematical formula for resolving the substantiality issue, and it will depend on the circumstances of the individual case."). However, "[c]ontributions that are merely nominal, or gratuitous, token cash infusions" will not suffice to meet this requirement. Id. at 1131 (internal quotation and citations omitted). In evaluating whether an infusion is substantial in a particular case, courts are to look at the infusion to determine whether it is real and necessary to the successful implementation of the plan. See In re Woodbrook, 19 F.3d at 320.
 
 
 34
 In this case, under the proposed plan, the investors would infuse $6.125 million into the reorganized debtor to make the reorganization plan work. This capital, the bankruptcy court determined, had a present value of over $4 million. The bankruptcy court, in finding that the amount to be infused was substantial, stated:
 
 
 35
 Here, the new value being contributed by the partners is substantial both in absolute terms and in its impact in this case. The $4.1 million minimum value of the contribution in this case dwarfs the $30,000 involved in Snyder and the $100,000 in Woodbrook.... The new value contributions proposed by the September 11 plan are not mere tokens, but genuine contributions to the proposed plan.
 
 
 36
 In re 203 N. LaSalle St. Ltd. Partnership, 190 B.R. 567, 588 (Bankr.N.D.Ill.1995). The court also noted that, as a percentage of Bank America's unsecured debt, the contribution amounted to 10.7% of that amount. Cf. In re Woodbrook, 19 F.3d at 320 (rejecting invocation of new value corollary when contribution was at most 3.8% of unsecured debt); In re Snyder, 967 F.2d at 1131 (rejecting invocation of new value corollary when contribution was 2.7% of unsecured claims). We are not firmly convinced that the bankruptcy court made an error in its determination that this amount, in absolute terms and when viewed as a percentage of Bank America's unsecured claim, was substantial. In addition, the bankruptcy court, in evaluating the feasibility of the plan, found that the infusion of new capital was necessary for the successful implementation of the plan. We have fully discussed this determination and concluded that the bankruptcy court did not clearly err in its finding. We similarly believe that the court's ancillary conclusion that the new infusion was necessary to the success of the plan is adequately supported. We therefore hold that, given our deferential standards, the court did not clearly err in finding that the new value contributed under the plan is substantial. As such, we shall uphold the bankruptcy court's conclusion that the requirements for the new value corollary have been met.
 
 D. Impaired Class
 
 37
 Bank America maintains that the acceptance by the impaired class in this case does not meet the Bankruptcy Code's requirement that, when not all of the impaired classes agree to a proposed plan, at least one impaired class that is not an insider class vote to accept the plan. Bank America submits that the impaired class which approved the reorganization plan, here the trade claims, is an artificially impaired class of claims. Bank America, relying on In re Windsor on the River Associates, 7 F.3d 127 (8th Cir.1993),[14] argues that the reason LaSalle did not pay the trade claims in full under the plan was to create an impaired class that would likely vote in favor of the reorganization claim.[15] Both the bankruptcy and district courts rejected this argument. The bankruptcy court found, and Bank America does not dispute, that the trade claims are impaired. Under the plan, the trade creditors will not receive the interest due to them on their claims. This is definitely an impairment under the Code. See In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1321 (7th Cir.1995) (stating that "any alteration of the rights constitutes impairment") (internal quotation and citation omitted). The bankruptcy court further found that the plan was proposed in good faith and that it was necessary, given the total funds that LaSalle had on hand, for the plan to impair some unsecured claims. The court therefore concluded that it did not violate the requirements of the Code for LaSalle to impair the trade claims, even though LaSalle had enough capital that it could have paid these claims in full, so that it would have more money available for reorganization and payment for the bank's claims. The district court concluded that the bankruptcy court's finding that the trade debt class was legitimately impaired was not clearly erroneous.
 
 
 38
 Although we have never before adopted the Eighth Circuit's "artificial impairment" test, we believe that, even assuming that the Eighth Circuit's interpretation of § 1129(a)(10) is the appropriate standard, the bankruptcy court did not err in its application here. We have noted, in discussing In re Windsor, that "[a] finding of 'artificial impairment' requires an inquiry into the purposes of the debtor." In re Wabash, 72 F.3d at 1321 n. 10. In re Windsor recognizes that the question of motivation is one for the bankruptcy court, whose resolution of the question is entitled to deference. 7 F.3d at 132. The bankruptcy court found that there were legitimate reasons for impairing the trade claims class. Impairing these claims allowed more money to be dedicated to the successful reorganization of the debtor. The court distinguished this situation from the one at issue in In re Windsor in which the only impairment was to wait 60 days to pay the "artificially impaired" class in full, and the debtor's only purpose for doing so, according to the Eighth Circuit, was to create an impaired class to approve the plan. In short, the bankruptcy court explicitly found that there was no lack of good faith by LaSalle's failure to pay the trade claims in full. We are not left with the definite and firm conviction that the bankruptcy court has made a mistake with respect to this issue.
 
 E. Other Issues
 
 39
 Bank America presses several other claims on appeal, but they need not detain us long. First, Bank America claims that the bankruptcy court clearly erred when it found that the plan subjected its unsecured claim to unfair discrimination. The bankruptcy court agreed with Bank America that the plan discriminated between the unsecured trade claims and Bank America's unsecured deficiency claim. The court, however, disagreed that the discrimination was unfair; indeed, the bankruptcy court found that any discrimination between these claims' treatment under the plan redounds to the benefit of Bank America.
 
 
 40
 Section 1129(b)(1), which applies to the cramdown confirmation of reorganization plans, provides that a plan may be confirmed only if "the plan does not discriminate unfairly ... with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). No one contends that the confirmed plan does not discriminate between classes. Under the plan, the unsecured trade creditors would receive 100% of their claims, except for the interest thereon, and Bank America, according to the court, would receive only 16% of its unsecured deficiency under the plan. However, the bankruptcy court found that this discrimination was not unfair because there was a legally acceptable rationale to support this disparity. Under § 1129(a)(7), the "best interest" test, for a cramdown proposal to be confirmed, each of the creditors in the Chapter 11 reorganization must receive at least as much as they would under a Chapter 7 liquidation. Under such a liquidation, the trade creditors would have been paid in full; whereas, because the unsecured deficiency claim is a statutory creation of Chapter 11, Bank America would not have received anything for the deficiency amount. Consequently, the bankruptcy court reasoned, the disparity between these claims, with the trade creditors receiving 100% and Bank America receiving 16%, is not unfair. Bank America does better than it would have under Chapter 7, and the trade creditors do no worse. Additionally, the plan called for the payment of the bank's unsecured deficiency claim before any insider creditor would be paid. Finally, the bankruptcy court concluded that this discrimination is narrowly tailored to meet the requirements of the "best interest" test. We believe that this explanation adequately explains the difference in treatment between the two classes of unsecured claims, and the bankruptcy court did not clearly err in refusing to find this discrimination unfair.
 
 
 41
 Second, Bank America contends that, because the primary subjective purpose of the investors in the reorganized debtor is to stave off the tax liability they would incur if the bank were to foreclose, the plan was not proposed in good faith. To be confirmed, a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Though the term 'good faith,' as used in section 1129(a)(3), is not defined in the Bankruptcy Code, ... the term is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.' " In re Madison Hotel Assocs., 749 F.2d 410, 424-25 (7th Cir.1984) (citations omitted). "According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code." Id. at 425. We begin our inquiry by noting that the bankruptcy court's finding that the plan was proposed in good faith is a finding of fact to which we owe deference. See In re Andreuccetti, 975 F.2d 413, 420 (7th Cir.1992). The primary evidence to the contrary that Bank America provides is that the purpose for the reorganization is a desire by the investors to avoid a significant tax liability.[16] This, in and of itself, is insufficient to establish that the bankruptcy court clearly erred because the desire to avoid significant tax liabilities, if legal, is a result consistent with the Bankruptcy Code. See In re James Wilson Assocs., 965 F.2d 160, 170 (7th Cir.1992) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy--why else would one declare it?"). Bank America also posits that the plan was not proposed in good faith because the risk of the plan falls squarely on Bank America. The bankruptcy court, however, found otherwise. Much of the risk of the plan falls on the shoulders of the new investors. Moreover, Bank America, by focusing on the tax consequences to the plan's investors, appears to be urging that we look at the subjective motivations of those proposing the plan. In re Madison's teachings are to the contrary. The bankruptcy court cataloged the objective benefits and likely results of the plan, and these are not inconsistent with the Code. We therefore hold that the bankruptcy court did not clearly err when it determined that the plan it confirmed was proposed in good faith.
 
 
 42
 Finally, Bank America asks that, if we reverse the district and bankruptcy courts' holdings on any issue, we also reverse the bankruptcy court's orders denying (1) relief from the automatic stay and (2) Bank America's request to convert or dismiss the case. Because we uphold the district court's judgment in its entirety, we deny Bank America's request.
 
 Conclusion
 
 43
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 44
 AFFIRMED.
 
 
 45
 KANNE, Circuit Judge, dissenting.
 
 
 46
 Although I agree with the way the majority opinion handles many of the issues in this case, I must dissent because the plain language of the absolute priority rule, see 11 U.S.C. § 1129(b)(2)(B)(ii), does not include a new value exception. Moreover, even if one strains and finds ambiguity in the language of the statute, thus necessitating a look at pre-Code practice, see Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the shaky foundation of the pre-Code new value exception coupled with the massive changes in bankruptcy procedures brought on by the Bankruptcy Code demonstrate that Congress did not intend to insert a new value exception into § 1129(b)(2)(B)(ii).
 
 I. PLAIN LANGUAGE
 
 47
 A reorganization plan must be "fair and equitable" to be implemented over the objection of an impaired class of creditors. The absolute priority rule helps define what is "fair and equitable" under a reorganization plan. See 11 U.S.C. § 1129(b)(2). A "fair and equitable" plan meets one of two requirements: (1) a class of unsecured creditors must receive property equal to the value of its claim on the effective date of the plan, see § 1129(b)(2)(B)(i), or (2) a dissenting class of unsecured creditors must be fully provided for before any junior class can receive or retain property under the plan, see § 1129(b)(2)(B)(ii) ("the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property"). In this case, the reorganization plan (the "Plan") does not satisfy the first prong because Bank America will not receive property equal to the value of its $38.5 million deficiency claim on the effective date of the Plan. The Plan also does not satisfy the second requirement--the absolute priority rule--because it permits LaSalle's partners, whose interests are junior to those of Bank America, to "receive or retain" property--i.e., the exclusive right to retain their equity interests[1]--"on account of" their junior equity interests.
 
 
 48
 The majority maintains that LaSalle's partners do not retain a property interest "on account of" their prior equity interest, but rather " 'on account of' a new, substantial, necessary and fair infusion of capital." Ante, at 964. The majority nonetheless admits, as it must, that "the new investors in the plan can be said to have the opportunity to invest and to control the company 'on account of' their previous relationship with the debtor." Ante, at 964; see also In re Bonner Mall Partnership, 2 F.3d 899, 909 (9th Cir.1993) ("[I]n some larger sense the reason that former owners receive new equity interests in reorganized ventures is that they are former owners."), motion to vacate denied and cert. dismissed as moot, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). Despite this concession, the majority asserts that only "[a]s a matter of abstract logic, and ... of semantics," one can argue that LaSalle's partners retained property "on account of" their prior interests, and it further surmises that Congress "might well have intended a more direct causation between the property received by the debtor and the old equity interest." Ante, at 964; see also Bonner Mall, 2 F.3d at 909 (noting that "[c]ausation for any event has many and varied levels" and asserting that Congress surely intended a more "direct or immediate causation"). The majority instead believes that the statute implicitly incorporates a "new value corollary" that permits prior interest holders to retain their interests by infusing new capital into the indebted property. The plain language of § 1129(b)(2)(B)(ii), however, fails to even hint at such a corollary or exception. Indeed, this position not only belittles the straightforward language of § 1129(b)(2)(B)(ii) but also ignores the application of that language to the facts of this case.
 
 
 49
 The Plan permits LaSalle's partners to retain their equity interests "on account of" two separate factors. LaSalle and the majority opinion correctly assert that LaSalle's partners retain their ownership interests "on account of" their new capital contributions. One cannot contest the fact that the partners' new capital contributions are one reason why they are able to maintain their ownership of the indebted property. LaSalle's partners, however, receive this exclusive ownership right only "on account of" their unique status as prior equity holders. The Plan's grant of this exclusive right to LaSalle's partners thus provides a necessary element that causes the prior equity holders to retain their junior interests before the satisfaction of Bank America's deficiency claim. "Abstract logic" and "semantics" do not suggest this conclusion--the requirements of the Plan and the language of the statute mandate it.
 
 
 50
 The motivations of LaSalle's partners magnify this point. They put new capital into the indebted property only so they could postpone the tax losses that they would incur in a foreclosure. In other words, regardless of the new capital contributions provided by LaSalle's partners, the presence of (and the potential tax liability inherent in) the partners' prior equity interests motivated the Plan's inclusion of the partners' exclusive right to retain their equity interests. The most natural and literal reading of this statute, when applied to the facts of this case, leads one to the inescapable conclusion that LaSalle's partners are retaining their equity interests "on account of" their junior interests in the property.
 
 
 51
 The Fourth Circuit, in In re Bryson Properties, XVIII, 961 F.2d 496 (4th Cir.1992), adopted this very reasoning in rejecting a debtor's request for application of the new value exception. Id. at 504. Bryson refused to approve a reorganization plan that gave prior equity holders the exclusive right to " 'buy' the [indebted] property without exposing it to the market or otherwise allowing any other party ... the opportunity to bid." Id. Although the Fourth Circuit did not explicitly hold in so many words that § 1129 does not include a new value exception or corollary, the outcome of the case reveals a strong devotion to the straightforward language of § 1129(b)(2)(B)(ii) and an implicit rejection of the new value exception.[2]
 
 
 52
 The majority's reading of the statute effectively inserts the words "solely or primarily" before "on account of": "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan SOLELY or PRIMARILY on account of such junior claim or interest any property." The majority, in other words, qualifies the text of § 1129, and thus permits a departure from an otherwise firm rule that a bankruptcy entity's assets should be assigned by absolute priority. Perhaps the majority's reasoning is driven by the fear that a "but for" interpretation would prevent old equity from ever participating in a reorganized entity--something Congress could never have intended. Indeed, such a result would border on the absurd, but a simpler, "but for" causation requirement would not preclude junior interests from participating in a reorganized entity. If prior equity holders earn their shares in an open auction, for example, their received interests would not be "on account of" their junior interests but "on account of" their capital contributions. See In re Greystone III Joint Venture, 995 F.2d 1274, 1283 (5th Cir.1991), withdrawn on rehearing (1992) (Judge Jones dissented from the withdrawal of Part IV, which discusses the new value exception); Bryson, 961 F.2d at 504; In re Outlook/Century Ltd., 127 B.R. 650, 654 n. 4 (Bankr.N.D.Cal.1991).
 
 
 53
 Moreover, the majority opinion fails to consider how its interpretation of the words "on account of" in § 1129(b)(2)(B)(ii) compares to the use of those same words in other parts of the same section. Section 1129(b)(2)(B)(i), for example, provides that a plan is fair and equitable with respect to a class of unsecured claims if "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value ... equal to the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(B)(i) (emphasis added). In this subsection, "on account of such claim" takes a simple, ordinary "but for" or "because of" meaning. In other words, § 1129(b)(2)(B)(i) provides that a plan is fair and equitable with regard to an impaired, unsecured claim if the holder of an unsecured claim receives a value equal to that particular unsecured claim. It would unduly complicate the statute, and indeed make no sense, to insert "primarily or solely" before "on account of such claim" in subsection § 1129(b)(2)(B)(i). Congress surely could not have intended such a meaning for that subsection. Nonetheless, the majority seems to think that Congress intended such a meaning for the very same words in the very next subsection. Such a reading of § 1129(b)(2)(B)(ii) ignores the well-established cannon of statutory interpretation that "identical words used in different parts of the same act are intended to have the same meaning." Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990) (quoting several prior Supreme Court cases); see also United States v. Nippon Paper Indus. Co., 109 F.3d 1, 4-5 (1st Cir.1997) ("It is a fundamental interpretive principle that identical words or terms used in different parts of the same act are intended to have the same meaning.... This principle--which the Court recently called 'the basic cannon of statutory construction'--operates not only when particular phrases appear in different sections of the same act, but also when they appear in different paragraphs or sentences of a single section.") (citations omitted), petition for cert. filed, 65 U.S.L.W. 3839 (U.S. June 13, 1997) (No. 96-1987).
 
 
 54
 Furthermore, I cannot subscribe to the notion that the language of § 1129(b)(2)(B)(ii) must be deemed ambiguous merely because the case law and the academic literature have interpreted it in different ways. The majority relies upon Dewsnup in stating that the "mere recitation of the possible interpretations" of the absolute priority rule renders § 1129's language ambiguous. Ante, at 964. But Dewsnup and other Supreme Court precedent also command courts to apply a statute's unambiguous language without looking beyond it. See Dewsnup, 502 U.S. at 419-20, 112 S.Ct. at 779 ("Of course, where the language is unambiguous, silence in the legislative history cannot be controlling."); Union Bank v. Wolas, 502 U.S. 151, 155-56, 112 S.Ct. 527, 530, 116 L.Ed.2d 514 (1991) ("Given the clarity of the statutory text, respondent's burden of persuading us that Congress intended to create or to preserve a special rule ... is exceptionally heavy."); United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240-41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute."). As Justice Scalia noted in his dissent in Dewsnup, the Supreme Court has "never held pre-Code practice to be determinative in the face of ... contradictory statutory text." Dewsnup, 502 U.S. at 433, 112 S.Ct. at 786 (Scalia, J., dissenting).
 
 
 55
 A natural reading of § 1129(b)(2)(B)(ii) prohibits a junior interest holder from retaining property in the debtor "on account of" or "because of" its status as a prior interest holder. The Plan in this case gives LaSalle's partners the exclusive right to retain their ownership interest in the indebted property because of their status as a prior interest holder. Because the straightforward text of the statutory absolute priority rule prohibits such a Plan where there are dissenting, unsecured creditors, I see no need to look beyond the words of the statute.
 
 II. PRE-CODE PRACTICE
 
 56
 Assuming, arguendo, that the language of § 1129(b)(2)(B)(ii) is ambiguous, a review of the pre-Code bankruptcy practice does not dictate the adoption of the new value exception. In Dewsnup, the Supreme Court noted that Congress did "not write 'on a clean slate' " when amending the bankruptcy laws and that the "Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history." Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. Because nearly everyone agrees that the legislative history "sheds little light" on the vitality of the new value exception, see Bryson, 961 F.2d at 504 n. 13,[3] the majority uses Dewsnup to argue that we must interpret the Code to include the new value exception.
 
 
 57
 While pre-Code practices have long helped courts interpret ambiguous Bankruptcy Code provisions, they cannot require courts to read unestablished, disputed, or outdated pre-Code principles into the Code. Dewsnup understated its point that Congress does not write on a clean slate when amending the bankruptcy laws because "Congress in fact writes bankruptcy laws on a very messy slate." In re A.V.B.I., Inc., 143 B.R. 738, 746 (Bankr.C.D.Cal.1992). For that reason, "[i]mporting concepts from past reorganization cases into interpretation of the Code must be done gingerly, with proper attention to the context in which the original case arose." Id.
 
 
 58
 In Dewsnup, for example, once the Court found the language of 11 U.S.C. § 506 to be ambiguous, its look at the pre-Code practice regarding the involuntary reduction of a creditor's lien arguably proved to be a fruitful venture. See Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. But see A.V.B.I., 143 B.R. at 744-47 (questioning Dewsnup's conclusion regarding the established nature of the relevant pre-Code practice). The Dewsnup Court noted that its own cases had not permitted involuntary reductions and that, indeed, such reductions might face constitutional scrutiny under the Takings Clause. See Dewsnup, 502 U.S. at 419, 112 S.Ct. at 779. Dewsnup also found legislative history suggesting that Congress intended for § 506(d) to permit liens to pass through bankruptcy unaffected. See id. The Court therefore reasoned that because the bankruptcy laws had never permitted such a reduction of a creditor's lien, Congress could not have intended to "grant a debtor [a] broad new remedy" without mentioning that remedy in the Code or the legislative history.[4] Id. at 420, 112 S.Ct. at 779.
 
 
 59
 In the situation of the absolute priority rule, however, a critical look at the pre-Code practice does not reveal Congress's intent to include a new value exception in § 1129(b)(2)(B)(ii). Rather, the Bankruptcy Code so fundamentally altered the pre-Code reorganization and confirmation procedures that strict adherence to the pre-Code new value exception might contravene Congress's intent in codifying the absolute priority rule.
 
 
 60
 The reasonableness of reading the pre-Code new value exception into the codified absolute priority rule is initially harmed by the questionable foundation upon which that exception rests. The Supreme Court's "creation" of the new value exception in Case v. Los Angeles Lumber Prods., Co., 308 U.S. 106, 121-22, 60 S.Ct. 1, 10-11, 84 L.Ed. 110 (1939), was merely dicta because the Court ultimately ruled that nonmonetary value cannot sufficiently satisfy any type of new value exception. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 203-04, 108 S.Ct. 963, 966-67, 99 L.Ed.2d 169 (1988); Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1361 (7th Cir.1990). In addition, Case never remarked on whether creditors must consent to a plan that permits old equity holders to input new capital in order to retain ownership of the debtor even though the Supreme Court case upon which Case's dicta relied--Kansas City Terminal R. Co. v. Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028 (1926)--presented such a situation. See Kham & Nate's, 908 F.2d at 1361. Furthermore, the Supreme Court has never upheld the confirmation of a new value plan over a creditor's objection, see A.V.B.I., 143 B.R. at 743, the Court has expressly stated that the vitality of the new value exception is an open issue, see Ahlers, 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3, and the district and bankruptcy courts are divided on the issue, see J. Ronald Trost, et al., Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, CA46 ALI-ABA 479, 540-43 (1995). "[L]ike other Supreme Court dicta," it seems that the " 'new value' exception has taken on a life of its own in the lower courts." A.V.B.I., 143 B.R. at 743 (citing John D. Ayer, Rethinking Absolute Priority After Ahlers, 87 Mich. L.Rev. 963, 1016 (1989)); see also Kham & Nate's, 908 F.2d at 1360 ("So far as the Supreme Court is concerned, however, the development [of the new value exception] has been 100% dicta."). And unlike Dewsnup, there is no express legislative history suggesting that Congress intended the exception to survive.
 
 
 61
 Moreover, the bankruptcy law principles underlying the "creation" and "development" of the new value exception differ greatly from those under the present Bankruptcy Code. Prior to the enactment of the Code in 1978, bankruptcy law consisted of a number of provisions differing from each other regarding the confirmation of reorganization plans and the existence of "fair and equitable" standards in those situations. In Case, for example, Section 77B of the Bankruptcy Act of 1898 required that creditors unanimously consent to a debtor's reorganization plan and that the plan meet a "fair and equitable" standard developed under the common law. See Case, 308 U.S. at 114-15, 60 S.Ct. at 6-7; Kham & Nate's, 908 F.2d at 1360-61. Section 77B, which lasted only 4 years, quickly gave way to Chapters X and XI of the Bankruptcy Act. 7 Collier on Bankruptcy, p 1129.04[c], at 1129-105 (Lawrence P. King ed., 15th rev. ed.1997). Chapter X retained Section 77B's "fair and equitable" requirement, and it mandated the appointment of a disinterested trustee to control the reorganization of the debtor. Id. p 1129.04[c], at 1129-106.[5] Chapter XI included a "fair and equitable" rule when enacted in 1938, but that concept was repealed from Chapter XI in 1952. Id. p 1129.04[b], at 1129-92 n. 105.[6]
 
 
 62
 The enactment of the Bankruptcy Code in 1978, however, fundamentally changed this bankruptcy backdrop. Chapter 11 of the Code "reflects a melding of concepts derived from several [of these and other] distinct bodies of pre-Code law" combined with the "conscious purpose ... to create a new chapter that represented the best of all these approaches to reorganization." A.V.B.I., 143 B.R. at 746-47. Significantly, the Code eliminated the unanimous consent requirement among creditors, see 11 U.S.C. § 1126(c), and it required a "fair and equitable" test whenever an impaired class of creditors rejects a reorganization plan, see 11 U.S.C. § 1129(b)(1). The Code, moreover, provided the first codification of this "fair and equitable" test. See 11 U.S.C. § 1129(b)(2). The present, increased flexibility in confirming reorganization plans coupled with new codifications thus represents a significant change from pre-Code bankruptcy law and arguably renders the new value exception unnecessary. See Greystone III, 995 F.2d at 1282, 1285 (Jones, J., dissenting).
 
 
 63
 Current bankruptcy practice also differs from pre-Code practice because most Chapter 11 cases are now operated by debtors-in-possession rather than court-appointed trustees. See A.V.B.I., 143 B.R. at 743. When the Court decided Case, a new value exception to the absolute priority rule may not have been objectionable to creditors because the court-appointed trustee would presumably sell the property back to the equity holders only after it "examined the books and operations" and had not "unearthed any dishonesty or mismanagement." Id. The present Chapter 11 framework, however, "permits uninterrupted control by insiders," and therefore creates situations where creditors fear that the reorganizations "are run for the private benefit of existing salaried management and the equity holders, with the intent of unfairly squeezing out the creditors." Id.
 
 
 64
 The enactment of the Code further altered prior bankruptcy practice by removing bankruptcy judges' "equitable powers to modify contracts to achieve 'fair' distributions." Kham & Nate's, 908 F.2d at 1361. "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." Ahlers, 485 U.S. at 206, 108 S.Ct. at 969. The notion that the Code, rather than equitable principles, permits a non-consensual plan to "sell" the indebted property to its old owners flies in the face of Chapter 11 and Ahlers: "The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents' reorganization plan was confirmed. But that determination is for the creditors to make in the manner specified by the Code." Ahlers, 485 U.S. at 207, 108 S.Ct. at 969; see also id. (providing that "it is up to the creditors--and not the courts--to accept or reject a reorganization plan which ... fails to honor the absolute priority rule"). "In effect, Section 1129(b)(2)(B) of the Code gives the creditors--not the court--the right to decide whether to waive the absolute priority rule." A.V.B.I., 143 B.R. at 744.
 
 
 65
 In light of the elimination of the unanimous consent requirement, the current trend of operation by debtors-in-possession, and the decrease of bankruptcy courts' equitable powers, retaining the "new value exception" arguably gives debtors a "broad new remedy"--exactly the sort of balance-upsetting interpretation that Dewsnup rejected. The present case is therefore more like Wolas than Dewsnup.
 
 
 66
 The debtor in Wolas maintained that 11 U.S.C. § 547(c)(2), which makes an exception to the rule authorizing a trustee to avoid certain property transfers made by a debtor within ninety days before bankruptcy, did not apply to payments on long-term debt. Although the text of § 547(c)(2) did not distinguish between long-term debt and short-term debt, the debtor argued, among other things, that Congress intended to codify the pre-Code "current expense" rule, which would ultimately limit § 547(c)(2)'s exception to short-term debt. Wolas, 502 U.S. at 158-59, 112 S.Ct. at 531-32. The Court rejected this argument, reasoning that there was no extrinsic evidence or legislative history suggesting that Congress intended to codify the current expense rule. Id. at 159 & n. 14, 112 S.Ct. at 532 & n. 14. Significantly, the Court also noted that the Code substantially enlarged the trustee's power to avoid preferential transfers, and that it could not "assume that the justification for narrowly confining the 'current expense' exception" to certain situations before the enactment of the Code should apply to an exception in the Code. Id. at 160, 112 S.Ct. at 532. Rather, "the fact that Congress carefully reexamined and entirely rewrote the preference provision in 1978 supports the conclusion that the text of § 547(c)(2) as enacted reflects the deliberate choice of Congress." Id. at 160, 112 S.Ct. at 532; see also id. at 160 n. 15, 112 S.Ct. at 532 n. 15 (citing the legislative history and noting that Congress intended to undo the "hopelessly complex" pre-Code preference section by proposing a "unified and coherent section to deal with the problems created by prebankruptcy preferential transfers"). In our case, as in Wolas, Congress significantly changed the underlying law upon which the pre-Code absolute priority rule and new value exception relied by creating a new Chapter 11 to deal with reorganization procedures and requirements.
 
 
 67
 Keeping in mind the significant differences in the pre-Code bankruptcy environment, strict adherence to a tenuous pre-Code practice makes little sense. Even if Dewsnup repudiated prior bankruptcy statutory interpretation cases like Wolas and Ron Pair and effectively mandated a review of pre-Code practice in any case where the parties disagree on the meaning of the statute's language, see Dewsnup, 502 U.S. at 435, 112 S.Ct. at 787 (Scalia, J., dissenting) ("I have the greatest sympathy for the Courts of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case."), the pre-Code rationale for the new value exception makes little sense in today's Chapter 11 environment. The majority, due to its uncritical adherence to Dewsnup, creates an anachronism by cutting and pasting pre-Code practice into a fundamentally different bankruptcy context. As a result, we are left with a new § 1129(b)(2)(B)(ii) that Congress likely never intended. For that reason, I must dissent from the majority's otherwise solid opinion.[7]
 
 
 
 *
 Circuit Judge Joel M. Flaum, did not participate in the consideration of the petition for rehearing en banc. Circuit Judges Coffey, Easterbrook, Manion, Kanne, and Diane P. Wood voted to grant rehearing en banc
 
 
 [1]
 See In re Woodbrook Assocs., 19 F.3d 312, 317 n. 2 (7th Cir.1994). In a Chapter 11 bankruptcy proceeding, a secured creditor, in most situations, may elect how his claim is treated. Lawrence P. King, Collier on Bankruptcy p 1103 (15th rev. ed.1997). A creditor with a lien on the debtor's property may elect either to continue to have its debt secured by the property in its full amount or to separate its claim in two: a secured claim in the amount of the value of the property and an unsecured claim for the deficiency amount. See 11 U.S.C. §§ 506(a), 1111(b). Bank America has chosen this latter course
 
 
 [2]
 LaSalle originally owed $160,000 in unsecured trade debt, but after filing for bankruptcy, the general partners purchased some of the trade claims
 
 
 [3]
 The plan originally called for paying the trade claims 180 days after confirmation of the plan; the bankruptcy court confirmed the plan on the condition that LaSalle also agree to pay interest to the trade creditors on the principal amounts for the 180 days following confirmation
 
 
 [4]
 The bankruptcy reduced the value of the property at the time of confirmation, $55.8 million, by the amount that it would have cost Bank America to dispose of the property, $1.3 million, and arrived at a value of Bank America's secured loan in the amount of $54.5 million. Bank America also has an unsecured claim for the amount of the deficiency, the difference between its secured claim and the total amount that LaSalle owed the bank. Bank America's deficiency claim is for approximately $38.5 million
 
 
 [5]
 Section 1129 provides in relevant part:
 (a) The court shall confirm a plan only if all of the following requirements are met:
 (1) The plan complies with the applicable provisions of this title.
 ....
 (3) The plan has been proposed in good faith and not by any means forbidden by law.
 ....
 (8) With respect to each class of claims or interests--
 (A) such class has accepted the plan; or
 (B) such class is not impaired under the plan.
 ....
 (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by an insider.
 (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
 ....
 (b)(1) ... [I]f all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan ... if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.
 (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
 ....
 (B) With respect to a class of unsecured claims--
 ....
 (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
 11 U.S.C. § 1129.
 
 
 [6]
 The absolute priority rule derives from § 1129's "fair and equitable" requirement. See In re Snyder, 967 F.2d 1126, 1128 (7th Cir.1992) (tracing the absolute priority rule, conceptually, at least as far back as Northern Pac. R. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913)); King, Collier on Bankruptcy p 1129.04, at 1129-82 (tracing the rule back to Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939))
 
 
 [7]
 Although the question of whether the new value corollary survived Congress' passage of the Bankruptcy Code has not been determined definitively in this circuit, we have considered it on several occasions without deciding the issue. See, e.g., In re Wabash; In re Woodbrook; In re Snyder, 967 F.2d 1126, 1130 (7th Cir.1992); Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351 (7th Cir.1990); In re Stegall, 865 F.2d 140 (7th Cir.1989). Our previous opinions have provided conflicting, albeit tentative, suggestions on the directions that we might take. We have intimated on occasion that the passage of the Bankruptcy Code has left the new value corollary intact. See In re Woodbrook, 19 F.3d at 320 ("The current trend is to treat the new value precept not as an exception (as it was commonly called) but as a corollary to the absolute priority rule preserved in the 1978 Code."); In re Snyder, 967 F.2d at 1129 (concluding after significant discussion that "[t]here is nothing in either the text or the legislative history of § 1129(b) that can be said to demonstrate a clear intent to modify seventy-five years of judicial construction of the absolute priority doctrine or its new value exception"); cf. In re Potter Material Serv., Inc., 781 F.2d 99, 101-04 (7th Cir.1986) (applying new value corollary without discussion of whether exception survived the Code). But see In re Stegall, 865 F.2d 140, 142 (7th Cir.1989) (noting that question was open, despite In re Potter). On the other hand, we have indicated that the new value exception might have been abolished by the codification of the absolute priority rule without also incorporating the new value exception. Such a course would result in a holding that the absolute priority rule is absolute: There is no new value exception after the passage of the Bankruptcy Code. See Kham & Nate's Shoes, 908 F.2d at 1360-61 (characterizing the new value exception as judicial dicta and noting that the language of the Code and legislative history suggest that the exception vanished in 1978). We note that the panel in Kham & Nate's Shoes did not have the benefit of the Supreme Court of the United States' opinion in Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). As we explain below, Dewsnup is instructive on this issue
 
 
 [8]
 The district and bankruptcy courts are quite divided over this issue, but a majority of such courts have concluded that the new value corollary survived the passage of the Bankruptcy Code. See J. Ronald Trost, Joel G. Samuels & Kevin T. Lantry, "Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification," CA46 ALI-ABA 479, 540-43 (1995) (surveying 88 published district court and bankruptcy court decisions, issued after the Supreme Court's decision in Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), and involving the new value corollary, and stating that, of these, 73% (64 cases) explicitly or implicitly found the new value corollary survived passage of the Bankruptcy Code, 11% (10 cases) determined that it did not, and 16% (14 cases) did not resolve the issue); see also, e.g., BT/SAP Pool C Assocs. v. Coltex Loop Central Three Partners, 203 B.R. 527, 534 (S.D.N.Y.1996) (new value corollary survived codification of absolute priority rule); In re Way Apartments, D.T., 201 B.R. 444, 455 (N.D.Tex.1996) (same); In re Sea Garden Motel & Apartments, 195 B.R. 294, 301 (D.N.J.1996) (noting that most courts have recognized the continued existence of the new value corollary); In re Elmwood, Inc., 182 B.R. 845, 852-53 (D.Nev.1995) (applying new value corollary). Academics and commentators, too, have not agreed on the issue. See, e.g., Edward S. Adams, "Toward a New Conceptualization of the Absolute Priority Rule and its New Value Exception," 1993 Det. C.L.Rev. 1445 (concluding that corollary is still viable); Bruce A. Markell, "Owners, Auctions, and Absolute Priority in Bankruptcy Proceedings," 44 Stan. L.Rev. 69 (1991) (same); Jarlon Tsang, Note, 14 Ann. Rev. Banking L. 361 (1995) (same); Clifford S. Harris, Note, 89 Mich. L.Rev. 2301 (1991) (same); Michael H. Strub, "New Value Rule: Applying the Single-Asset Paradigm," 111 Banking L.J. 228 (1994) (concluding pre-Code practice not viable); John D. Ayer, "Rethinking Absolute Priority after Ahlers," 87 Mich. L.Rev. 963 (1989) (same); Julie L. Friedberg, Comment, 66 Temp. L.Rev. 893 (1993) (same); Salvatore G. Gangemi & Stephen Bordanaro, Note, "The New Value Exception: Square Peg in a Round Hole," Am. Bankr.Inst. L.Rev. 173 (1993) (same)
 
 
 [9]
 See, e.g., Mason v. Paradise Irrigation Dist., 326 U.S. 536, 541-42, 66 S.Ct. 290, 292-93, 90 L.Ed. 287 (1946); Marine Harbor Properties v. Manufacturer's Trust Co., 317 U.S. 78, 86, 63 S.Ct. 93, 97-98, 87 L.Ed. 64 (1942); Case v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939)
 
 
 [10]
 See In re Snyder, 967 F.2d at 1130 (discussing the Bankruptcy Commission proposal). The proposal was rejected. Because the proposal sought to expand the scope of the new value corollary, Congress' rejection of the proposal hardly supports the view that Congress intended to abolish the entire new value exception. The existence of the proposal assures us of Congress' awareness of the exception
 
 
 [11]
 There are differing views about the effectiveness of the Code's attempt to give the proponents of the plan some flexibility in this regard. The confirmation standard contained in section 1129 still allows slightly more than one third of a class of creditors to veto a plan accepted by every other party to the reorganization and permits a large investor who owns an entire class of securities to thwart any confirmation plan involving shareholder participation
 
 
 [12]
 During times of financial instability, banks often restrict the number of outstanding loans. The resulting "credit crunch" affects the ability of businesses to obtain the capital that they need. During such a period, shareholders might represent the only source of financing for the reorganization of an entity in reorganization
 
 
 [13]
 The Ninth Circuit has concluded that the new value exception is alive and well. In re Bonner Mall Partnership, 2 F.3d 899, 907 (9th Cir.1993), cert. granted, 510 U.S. 1039, 114 S.Ct. 681, 126 L.Ed.2d 648, case dismissed, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (case dismissed as moot after parties reached settlement). The Sixth Circuit also has adopted the position that, even after the enactment of the Code, the new value corollary has vitality. See In re U.S. Truck Co., 800 F.2d 581, 588 (6th Cir.1986) ("If McKinlay were retaining an interest without contributing any capital, the plan would clearly violate the Code.... But McKinlay is giving up its prior interest and participating in the reorganized company by making a [capital] contribution."). The Fifth Circuit, in In re Greystone III Joint Venture, 995 F.2d 1274 (5th Cir.1991), cert. denied, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), analyzed the issue quite carefully and concluded that the exception did not survive the Code's enactment. However, after the Supreme Court's decision in Dewsnup v. Timm, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), the court on rehearing rescinded the portion of the opinion deciding the issue instead of evaluating how that decision would affect the case before the court. The Fourth Circuit, in In re Bryson Properties XVIII, 961 F.2d 496 (4th Cir.), cert. denied, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992), struggled with the issue and, after noting that neither the underlying policy reasons nor the legislative history leads to a clear answer, concluded that, in the case before it, the proposed plan, which included a provision by which the old equity holders' new capital contributions would be returned prior to the creditors' unsecured claim, could not be confirmed because the old equity holders retained property on account of their prior interests
 
 
 [14]
 In In re Windsor, the Eighth Circuit held that, "for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion.... Whether Debtor manipulated the terms of its plan for purposes of securing confirmation is a question of fact." 7 F.3d at 132
 
 
 [15]
 Because the plan was confirmed over Bank America's objections, in addition to meeting the other requirements of § 1129, the plan had to meet the "cramdown" requirements as well. " 'Cramdown' is the procedure for approving a reorganization plan in the face of creditor resistance. It requires that at least one class of impaired creditors approve the plan...." In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1313 (7th Cir.1995)
 
 
 [16]
 Bank America also asserts that the only purpose of the reorganization plan is to "stave off the evil day when the creditors take control of [the debtor's] property." In re James Wilson Assocs., 965 F.2d 160, 170 (7th Cir.1992). According to Bank America, under In re James Wilson, such a plan is a clear case of bad faith. However, unlike the situation contemplated in In re James Wilson, LaSalle did not "enter[ ] Chapter 11 knowing that there [was] no chance to reorganize [its] business." Id. Rather, two courts have already ruled that LaSalle is able to reorganize its business
 
 
 [1]
 A debtor's exclusive right to receive or retain an equity interest is property for purposes of the new value exception and the absolute priority rule. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 207-08, 108 S.Ct. 963, 969-70, 99 L.Ed.2d 169 (1988) ("Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property.' "); In re Bryson Properties, XVIII, 961 F.2d 496, 504 (4th Cir.1992) ("This exclusive right to contribute constitutes 'property' under § 1129(b)(2)(B)(ii), which was received or retained on account of a prior interest."); Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1360 (7th Cir.1990) ("An option to purchase stock also is 'property.' "); see also Ahlers, 485 U.S. at 208, 108 S.Ct. at 969 ("[W]hile the Code itself does not define what 'property' means as the term is used in § 1129(b), the relevant legislative history suggests that Congress' meaning was quite broad.")
 
 
 [2]
 Contrary to the majority's suggestion that the courts of appeals that have addressed this issue have all ruled that the new value exception did survive the enactment of the Bankruptcy Code, see ante, at 966 & n. 13, Bryson's outcome and analysis reveal that the circuits are not in agreement on the issue. The Ninth Circuit has conducted perhaps the most exhaustive discussion of the issue to date, and it determined that the new value exception remains viable. See Bonner Mall, 2 F.3d at 899. The Sixth Circuit also recognized, without discussion, the existence of the new value exception. See In re U.S. Truck Co., 800 F.2d 581, 588 (6th Cir.1986). A Fifth Circuit panel, however, originally concluded that the new value exception did not survive the enactment of the Code, see In re Greystone III Joint Venture, 995 F.2d 1274, 1281-84 (5th Cir.1991), withdrawn on rehearing (1992); two members of that panel later voted to withdraw the part of the opinion that dealt with the new value exception, apparently in response to Dewsnup. Id. at 1284-85 (Judge Jones dissented from the removal of the new value exception analysis.)
 
 
 [3]
 In this circuit, we have speculated inconclusively on the meaning of the sparse legislative history. Some cases have suggested that Congress's rejection of a proposal by the Bankruptcy Commission to modify the absolute priority rule and its exceptions reveals that Congress did not intend to include such an exception when enacting the Code. See, e.g., Kham & Nate's, 908 F.2d at 1361-62 (noting that Congress was aware of the rule and its exceptions when it adopted the "blanket" absolute priority rule without "suggest[ing] a single exception"). Other cases have pointed out, however, that the proposed (but rejected) rule sought to ease the requirements of the new value exception, and thus the "rejection of the modification could just as easily be construed as an endorsement of the status quo." In re Snyder, 967 F.2d 1126, 1130 (7th Cir.1992)
 
 
 [4]
 Justice Scalia's dissent in Dewsnup contends, however, that the language of § 506(a) & (d) unambiguously granted such a remedy. See Dewsnup, 502 U.S. at 420, 112 S.Ct. at 779
 
 
 [5]
 Under Chapter X, no shareholder ever convinced a court that it contributed sufficient value to retain an interest under the new value concept, and no reported case expressly adopted Case's new value dicta as its holding until the Code's enactment in 1978. 7 Collier on Bankruptcy, p 1129.04[c], at 1129-107
 
 
 [6]
 Because the absolute priority rule no longer applied to Chapter XI proceedings after 1952, cases under that chapter did not address any new value issues. 7 Collier on Bankruptcy, p 1129.04[c], at 1129-106 to 1129-107; see also id. p 1129.04[a], at 1129-84 to 1129-85. The number of parties that could potentially seek application of new value principles further declined due to a preference for filing under Chapter XI rather than Chapter X, which is partially explained by Chapter X's disinterested trustee requirement. Id. p 1129.04[c], at 1129-106
 
 
 [7]
 In furthering its reasoning, the majority lists the significant advantages gained by the existence of a new value exception to the statutory absolute priority rule. Ante, at 20-21; see also Bonner Mall, 2 F.3d at 915-16; Snyder, 967 F.2d at 1130. Much ink has already been spilled debating the benefits and detriments of the new value exception in the context of Chapter 11, and my opinion will likely add little to the debate. I do, however, feel that the majority's policy arguments should not go unanswered
 Without question, the ability to infuse new capital from old equity holders provides a valuable tool for reorganizations. The creditors, however, should be able to make the ultimate decision regarding whether to incorporate such new value. See Greystone III, 995 F.2d at 1284, 1285 (Jones, J., dissenting) ("It is dubious to suppose that courts will ordinarily possess superior foresight than the creditors themselves concerning the creditors' best interests."). Rejection of the new value exception, moreover, will not extinguish "new value" as a beneficial tool for reorganization. See Bryson, 961 F.2d at 504 (noting that if a "plan represents a reasonable business risk, creditors should be willing to forego immediate recoveries in exchange for the expectation of greater recoveries in the future, in which case they would consent to viable plans providing for new capital infusions"). Creditors regularly consent to new value plans, see A.V.B.I., 143 B.R. at 743, and they will continue to do so even when they are not faced with the threat of a cramdown, see Kham & Nate's, 908 F.2d at 1360 (noting that creditors effectively own bankrupt firms and that in many instances the creditors should be willing to consent to a voluntary plan that allows old equity holders to gain stock in return for inputting new value). Finally, providing this power to creditors alone, and removing it from the courts, will provide the incidental benefit of removing an "enormously complicating factor" from the "carefully balanced bargaining structure" used to formulate consensual reorganization plans. Greystone III, 995 F.2d at 1283-84, 1285 (Jones, J., dissenting); cf. Bonner Mall, 2 F.3d at 917 (discussing the need for bankruptcy courts to "carefully apply" the strictures of the new value exception in order to prevent old equity from circumventing the purpose of the absolute priority rule).